**In re APPLETREE MARKETS,
INC., et al., Debtors.**

**UNITED FOOD AND COMMERCIAL
WORKERS LOCAL UNION NOS. 455,
408, 540 AND 1000, Appellants,**

v.

**APPLETREE MARKETS,
INC., Appellee.**

**Civ. A. No. H–92–2714.**

United States District Court,
S.D. Texas,
Houston Division.

May 25, 1993.

Patrick M. Flynn, Houston, TX, for appellants.

Henry J. Kaim, Sheinfield, Maley & Kay, Houston, TX, for appellee.

## MEMORANDUM AND ORDER

LAKE, District Judge.

This is an appeal of a July 6, 1992, order of the bankruptcy court rejecting the collective bargaining agreements of United Food and Commercial Workers Local Union Nos. 455, 408, 540 and 1000's (collectively, the "UFCW") with the Debtor, AppleTree Markets, Inc.

### I. *Mootness of the Appeal*

AppleTree moves to dismiss this appeal, which the UFCW timely filed on July 15, 1992, as moot. AppleTree argues that the UFCW participated in the drafting of AppleTree's First Amended Disclosure Statement with respect to the Second Amended Plan of Reorganization under Chapter 11 of the United States Bankruptcy Court for AppleTree Markets, Inc. and its affiliated debtors (the "Plan"). According to Apple-Tree, the disclosure statement was premised in part upon the benefits that the bankruptcy estate would receive from the rejection by the bankruptcy court of the UFCW's collective bargaining agreements ("CBAs"). The bankruptcy court approved the Plan on September 29, 1992. Because the UFCW did not appeal the order confirming the Plan, it became final and nonappealable in October of 1992. The CBAs expired by their own terms earlier this year. AppleTree argues that the UFCW's present appeal of the bankruptcy court's order rejecting the CBAs is moot because the substantial consummation of the Plan has so changed the circumstances as to render appellate relief both ineffective and inequitable to the parties to the Plan.

AppleTree cites a number of cases that support the general proposition that substantial consummation of a confirmed plan may require that an appeal of the confirmation order be dismissed as moot in the absence of a stay of the order pending appeal. Dismissal of appeals from

confirmation orders on mootness grounds may be warranted because of one or more equitable considerations: (1) substantial consummation of a plan may preclude a reviewing court from granting effective relief if the confirmation order is set aside, (2) innocent parties may have acted in reliance upon the confirmation order, and (3) the relief sought on appeal may jeopardize the entire plan. The court finds persuasive the test for analyzing these considerations announced in *In re Club Associates, Inc.,* 956 F.2d 1065, 1069 (11th Cir.1992).

> The test for mootness reflects a court's concern for striking the proper balance between the equitable considerations of finality and good faith reliance on a judgment and the competing interests that underlie the right of a party to seek review of a bankruptcy court order adversely affecting him. (citation omitted)

 Unlike the appeal of a confirmation order by a disgruntled creditor, which is the context in which the mootness issue in the authorities cited by AppleTree usually arose, the UFCW does not seek to set aside the Plan; it only seeks to reverse the bankruptcy court's rejection order. The UFCW responds to AppleTree's argument about the court's inability to award effective appellate relief by stating that reversal of the bankruptcy court's rejection order would reinstate the CBAs and eliminate the UFCW's contract rejection claims. Because of the passage of time the CBAs have expired, however, and a reversal of the bankruptcy court's rejection order would not reinstate them. Reversal of the rejection order would, however, entitle the UFCW to argue that it has a post-petition claim for breach of contract, at least as to those covered employees who continued to work for AppleTree, instead of a prepetition claim for contract rejection damages.[1] Although AppleTree replies that even if the

court reversed the rejection order, Apple-Tree would not be liable for post-petition damages because there was no performance under the CBAs, that argument addresses the merits of such a claim, not whether this appeal is moot. Whether an appellate court can grant effective relief, in the face of a confirmed plan, depends upon a particularized evaluation of the circumstances of the case. *In re Club Associates,* 956 F.2d at 1069. The court is not persuaded that appellate relief would be ineffective were the court to reverse the bankruptcy court's rejection order.

AppleTree also argues that the UFCW's appeal is moot because (1) allowing this appeal to proceed would adversely affect the parties to the Plan, who relied to their detriment on its finality; (2) it would be unfair to allow the UFCW to potentially jeopardize the confirmed Plan because the UFCW did not seek a stay of the order rejecting the CBAs or the order confirming the Plan, and (3) a successful appeal by the UFCW would jeopardize the confirmed Plan.

 The facts show that the element of reliance is attenuated at best. Although the first amended disclosure statement to the Plan advised all parties of the bankruptcy court's order rejecting the collective bargaining agreements, it also advised them that the UFCW had appealed the order.[2] Any change in the circumstances of the parties to the Plan therefore occurred with full knowledge that the UFCW intended to pursue this appeal.

 A stay is but one factor to consider in evaluating a claim of mootness; it is not a *per se* requirement for an appeal. *In re Crystal Oil Co.,* 854 F.2d 79, 82 (5th Cir.1988). Although at oral argument the UFCW contended that it was "virtually impossible"[3] to obtain the bond that would be

---

1. According to the parties, the UFCW's contract rejection damages are between $7 and $11 million. As a prepetition claim, the UFCW would receive approximately eight cents on the dollar for these damages. As a post-petition claim for breach of contract, the UFCW could potentially recover the full amount of this claim.[1]

 1 See Transcript of February 22, 1993, hearing at pp. 6 and 10–11.

2. See Exhibit A to the UFCW's Response and Opposition to AppleTree's Motion to Dismiss (Docket Entry No. 7).

3. Transcript of February 22, 1993, hearing at pp. 13–14.

required as a condition for a stay, the court does not give much weight to this contention because the UFCW has presented no evidence of the efforts it undertook to obtain a bond.

On the other hand, the court does not give much weight to AppleTree's argument that a successful appeal would jeopardize the confirmed Plan. AppleTree's legal analysis and factual arguments focus on the havoc that a successful appeal *of the confirmed Plan* could cause AppleTree and third parties to the Plan rather than the effect of this appeal *of the rejection order* on the confirmed Plan. Although AppleTree argues that "[a]ny potential determination that AppleTree was liable for [post-petition breach of contract damages] will place AppleTree back in bankruptcy, ...,"[4] the court attributes little weight to this prediction because it is not supported by any facts, either in the memorandum in which it appears or in the supporting affidavit of AppleTree's chief financial officer, both of which are otherwise quite fact intensive.[5] Notably absent from AppleTree's motion to dismiss and its supporting memorandum is an explanation of how the various transactions consummated in reliance on the confirmed Plan or the survival of AppleTree as a viable business would be affected by a successful appeal of the order rejecting the CBAs.

This court has evaluated all of the arguments urged by AppleTree in support of its motion to dismiss. In attempting to strike a proper balance between these considerations the court is not persuaded that the confirmation and substantial consummation of the Plan have so changed the circumstances as to render appellate relief ineffective or inequitable. AppleTree's Amended Motion to Dismiss Appeal as Moot will therefore be denied.

In response to a question by the court AppleTree argues that the UFCW is barred under principles of *res judicata* from questioning on appeal the bankruptcy court's order rejecting the CBAs. AppleTree first argues that the bankruptcy court's determination in its confirmation order that the Plan was feasible, which included the court's evaluation of financial projections based in part on the court's earlier decision to reject the CBAs, precludes the UFCW from now challenging the rejection order in this appeal. According to AppleTree, since the UFCW did not argue at confirmation that the Plan was not feasible because the CBAs were valid and in effect, it is now precluded from questioning the efficacy of the bankruptcy court's rejection order by means of this appeal.

This argument is not persuasive because it overlooks the fact that the UFCW filed its notice of appeal of the bankruptcy court's rejection order on July 15, 1991.[6] The Second Amended Plan of Reorganization was not filed until August of 1992. Hearings to approve the First Amended Disclosure Statement occurred later that month, and the Plan was approved on September 29, 1992. The disclosure statement approved by the bankruptcy court expressly referred to the UFCW's pending appeal of the order rejecting AppleTree's CBAs with the UFCW. Under these facts it can hardly be contended that the bankruptcy court and the parties to the confirmation process were not aware that the UFCW disagreed with the bankruptcy court's rejection of the CBAs. Furthermore, the UFCW had no need to contest the propriety of that order during the plan confirmation process. The bankruptcy court had recently and thoroughly considered this issue, and there is no indication that raising the issue again during the plan confirmation process would cause the bankruptcy court

---

**4.** Supplemental Memorandum of AppleTree at ¶ 34, p. 19 (Docket Entry No. 10).

**5.** AppleTree makes a cryptic reference to a potential $9 million loss to it if the UFCW's appeal were successful. (Amended Memorandum of Points and Authorities Supporting Amended Motion to Dismiss Appeal as Moot, Docket En-

try No. 6 at ¶ 8, p. 6) However, AppleTree provides no explanation how this potential loss was calculated or why it would result from a successful appeal by the UFCW of the rejection order.

**6.** Bankruptcy Docket Entry No. 1151.

to change its mind. In addition, and perhaps more importantly, the UFCW's notice of appeal from the bankruptcy court's order rejecting the CBAs divested the bankruptcy court of jurisdiction of that aspect of the case. *In re Combined Metals Reduction Co.*, 557 F.2d 179, 200–201 (9th Cir.1977); *Midwest Properties No. Two v. Big Hill Investment Co.*, 93 B.R. 357, 359 (N.D.Tex.1988).

 In a slightly different twist on its *res judicata* argument AppleTree contends that the bankruptcy court's order confirming the Plan is binding on all parties, and *res judicata* prevents the UFCW from raising claims in a separate appeal that implicate components of the Plan because the UFCW failed to appeal the confirmation order itself. There are several problems with this argument. First, as explained above, the UFCW does not seek to set aside the Plan, but is appealing the bankruptcy court's order rejecting the CBAs. As a doctrine intended to recognize the finality of judgments, *res judicata* allows a judgment in one action to have conclusive effect in a second action. *See* Restatement (Second) of Judgments § 13 comment a (1982). The doctrine does not apply where, as here, a party attempts to use it as a basis to dismiss a direct appeal of a ruling of a lower court in the same action. *See In re A.J. Mackay Co.*, 50 B.R. 756, 758–759 (D.Utah 1985); *United States v. Novak*, 86 B.R. 625, 628 (D.S.D.1988).[7] Second, *res judicata* does not apply where there is no final judgment. *See Stevenson v. International Paper Co.*, 516 F.2d 103, 108 (5th Cir.1975). Here, the bankruptcy court's rejection order is far from final since by this appeal the UFCW seeks to reverse it. Finally, as explained above, the filing of a notice of appeal by the UFCW on July 15, 1992, divested the bankruptcy court of jurisdiction of the contract rejection claim before the court confirmed the Plan. Therefore, the UFCW could not have raised the contract rejection claim during the confirmation process, and the

confirmation order cannot be considered a final judgment that disposes of the rejection claim.

Neither version of AppleTree's *res judicata* argument persuades the court that the doctrine applies to AppleTree's appeal, or if it does, that the element of finality has been met. Accordingly, the court declines to dismiss the UFCW's appeal on grounds of *res judicata*.

## II. *The Merits of the Appeal*

 The UFCW argues that the bankruptcy court erred in granting AppleTree's motion to reject the CBAs. After a two-day hearing the bankruptcy court granted the motion and entered an order rejecting the CBAs. The court announced findings of facts and conclusions of law from the bench in support of its order. This court reviews legal determinations of the bankruptcy court under a *de novo* standard and reviews factfindings under a clearly erroneous standard with due regard given to the opportunity of the bankruptcy judge to evaluate the credibility of witnesses.

 To reject a collective bargaining agreement the bankruptcy court must find, pursuant to § 1113(c),

(1) that before the hearing on the motion for rejection the trustee has made a proposal to modify the agreement that fulfills the requirements of § 1113(b)(1),

(2) that the Union refused to accept the proposal without good cause, and

(3) that "the balance of the equities clearly favors rejection of such agreement."

The parties agree that in evaluating a motion for § 1113 rejection, a bankruptcy court must address nine factors announced in *In re American Provision Co.*, 44 B.R. 907, 909 (Bankr.D.Minn.1984) (footnote omitted):

(1) The debtor in possession must make a proposal to the Union to modify the collective bargaining agreement.

---

7. The cases cited at pages 22 and 23 of AppleTree's Supplemental Memorandum are inapposite. In none of them did the aggrieved party appeal from the particular order of the bankruptcy court, or from the confirmed Plan, that was used as a basis for satisfying the final judgment element of *res judicata*.

(2) The proposal must be based on the most complete and reliable information available at the time of the proposal.

(3) The proposed modifications must be necessary to permit the reorganization of the debtor.

(4) The proposed modifications must assure that all creditors, the debtor and all of the affected parties are treated fairly and equitably.

(5) The debtor must provide to the Union such relevant information as is necessary to evaluate the proposal.

(6) Between the time of the making of the proposal and the time of the hearing on approval of the rejection of the existing collective bargaining agreement, the debtor must meet at reasonable times with the Union.

(7) At the meetings the debtor must confer in good faith in attempting to reach mutually satisfactory modifications of the collective bargaining agreement.

(8) The Union must have refused to accept the proposal without good cause.

(9) The balance of the equities must clearly favor rejection of the collective bargaining agreement.

The bankruptcy court made findings addressing each of these factors.[8] The UFCW does not dispute the bankruptcy court's findings on factors 1, 2 and 6. It argues that because AppleTree failed in its burden of proof on factors 3, 4 and 5, AppleTree also necessarily failed to meet its burden on factors 7, 8 and 9.[9]

**Factor 5. The debtor must provide to the Union such relevant information as is necessary to evaluate the proposal.**

 Once the debtor shows what information it provided the Union, "[i]t is then incumbent upon the Union to produce

evidence that the information provided was not the relevant information which was necessary for it to evaluate the proposal." *In re American Provision Co.*, 44 B.R. at 909–910. The debtor bears the ultimate burden of persuasion on this and the other eight factors by a preponderance of the evidence. The UFCW argues that although AppleTree provided information, the information was insufficient for the UFCW to evaluate AppleTree's financial condition and the effect of the modifications to the CBAs proposed by AppleTree.

The bankruptcy court found that Apple-Tree provided the UFCW with all relevant information necessary to evaluate Apple-Tree's proposal.[10] In addition to receiving documentary information, the bankruptcy court found that the UFCW had the ability to ask specific questions to AppleTree about the factual basis for its proposals.

The record shows that immediately before it filed for bankruptcy AppleTree opened its books to the UFCW for examination and that AppleTree made information available to the UFCW during the bargaining process that followed.[11] During the ensuing negotiations the UFCW had available to its negotiating team financial analysts who could evaluate AppleTree's financial statement.[12] When negotiations intensified AppleTree furnished reports and other information[13] to allow the UFCW to evaluate AppleTree's proposals and to formulate proposals of its own.[14] Having read the record, this court concludes that the bankruptcy court's findings on factor 5 are not clearly erroneous.

**Factor 4. The proposed modifications must assure that all creditors, the debtor and all of the affected parties are treated fairly and equitably.**

---

8. July 3, 1992, transcript at pp. 148–157.

9. In their Joint Stipulation filed on July 1, 1992, AppleTree and the UFCW agreed that only factors 3, 4 and 5 were in controversy and that the bankruptcy court's resolution of factors 7, 8 and 9 would be governed by the court's evaluation of factors 3, 4 and 5.

10. July 3, 1992, transcript at pp. 151–153.

11. July 1, 1992, transcript at p. 116; July 3, 1992, transcript at pp. 79–84; Debtor's Exhibit 57.

12. July 3, 1992, transcript at p. 82.

13. E.g., July 1, 1992, transcript at pp. 116–117 and 139; Debtor's Exhibits 4A–F, 21, 35.

14. E.g., Respondent's Exhibit 4, the UFCW's June 10, 1992, proposal.

The bankruptcy court found that AppleTree's proposed modifications to the CBAs were fair and equitable to all affected parties.[15] The UFCW argues, as it did to the bankruptcy court, that AppleTree's proposed modifications were unfair because they did not require reductions in compensation for management and did not include any "snap-back" or other incentives to allow employees to recoup the reductions included in AppleTree's proposed modifications.

The bankruptcy court found, and the record corroborates, that AppleTree's costs under the CBAs were above prevailing competitive wage levels, while management salaries at AppleTree had already decreased from prior levels and were at or below prevailing levels among AppleTree's competitors. The evidence also showed that management had shared other burdens caused by AppleTree's bad financial condition. As AppleTree closed almost half of its stores, managers and assistant managers lost their jobs, with no opportunity to "bump" other managers and with no seniority to bump non-managerial employees for jobs at the stores that remained open.[16] In addition, health benefits for management had declined over the previous three years and were already less generous than similar benefits to employees under the UFCW's CBAs.[17] As part of its proposed modifications, AppleTree included additional reductions in vacation, health insurance, and other management benefits.[18] AppleTree determined that management salaries should not be reduced because the company was barely competitive at that level, was already experiencing difficulty in attracting people to entry-level management positions, and salary reductions among managers would result in losses of good people at this level.[19]

The evidence relevant to the proposed modifications of AppleTree's CBAs with the UFCW showed that of 48 new competing stores that entered markets served by AppleTree in the 30 months prior to November of 1991, 47 were non-union.[20] Of AppleTree's primary competitors only one—Kroger—operated under a CBA.[21] Of the 50 AppleTree stores to remain in operation under the Plan, only 10 faced Kroger as their primary competitor. The other 40 faced competition from non-union stores.[22]

Not only do AppleTree's non-union competitors pay less than AppleTree was obligated to pay under its CBAs with the UFCW, but AppleTree operated under less favorable work rules. Under its CBAs AppleTree paid time-and-a-half overtime after an eight-hour day, even if the employee worked only 40 total hours in a week, while its major competitors only paid overtime after an employee had worked more than 40 hours in a week.[23] AppleTree's proposed modification to the CBAs would have done away with this disparity and only required AppleTree to pay overtime after 40 hours.[24] AppleTree also paid premium pay on Sundays and holidays, while most of its competitors did not. The proposed modifications would have eliminated such premium pay.[25] AppleTree also proposed reducing vacation days and holidays and reducing its wage scale to prevailing wages in the marketplace.[26]

In addition, AppleTree proposed eliminating its obligation to guarantee that 50% of the store clerk hours were worked by full-

---

**15.** July 3, 1992, transcript at pp. 150–151.

**16.** July 1, 1992, transcript at pp. 40–41.

**17.** July 1, 1992, transcript at pp. 114–115.

**18.** July 1, 1992, transcript at p. 149; Debtor's Exhibit 21.

**19.** July 1, 1992, transcript at pp. 150–151; Debtor's Exhibit 42.

**20.** July 1, 1992, transcript at pp. 84–89; Debtor's Exhibit 36.

**21.** *Id.* at pp. 86–89; Debtor's Exhibit 37.

**22.** *Id.*

**23.** July 1, 1992, transcript at pp. 90–91.

**24.** *Id.*

**25.** *Id.* at 91–92 and 95.

**26.** *Id.* at 95–103; Debtor's Exhibit 50.

time employees in five-day, 40-hour weeks. The evidence showed that this rule had a negative effect on AppleTree's competitiveness because it prevented AppleTree from increasing staffing levels during peak business periods in the late afternoon and early evening unless it also increased the hours worked by full-time employees. This would necessarily mean that some of the additional hours worked by full-time employees would have to be scheduled in non-peak periods, when they were not necessary. AppleTree's competitors, most of whom did not operate under such a requirement, could schedule employees to work shifts of less than eight hours during the late-afternoon and early-evening peak periods.[27] All of these proposed modifications were to remain in effect until October 31, 1993, after which the parties were free to negotiate new agreements.

The UFCW's snap-back argument consists of two sentences: "The Company did not offer any snap-back or incentive to allow the employees to recover any of the sacrifices it was demanding. (Tr. 2:45–46) This is not fair and is not equitable."[28] The absence of a "snap-back" provision (which would restore employee wages in the future) in proposed modifications to a CBA is but one fact for the bankruptcy court to consider in determining whether the employer's modification is fair and equitable to all affected parties. The evidence conclusively established that the existing CBAs provided wages and benefits in excess of those paid by AppleTree's competitors, especially its more recent competitors. Absent modifications that made AppleTree competitive in its labor costs, the evidence established that AppleTree could not be successfully reorganized. The evidence showed that AppleTree's proposed modifications would permit it to reorganize and showed that, in the context of (1) previous adjustments to wages and benefits paid to management and to employees covered by the CBAs, and (2) market wage rates paid to management and employees by AppleTree's competitors, the proposed modifications were fair and equitable to management and to employees covered by the CBAs. Neither the absence of a snap-back provision nor the failure to reduce further the salary and benefits paid to management makes AppleTree's proposed modifications unfair or inequitable. Having carefully read the record, this court concludes that the bankruptcy court's findings with regard to this factor were not clearly erroneous.

**Factor 3. The proposed modifications must be necessary to permit the reorganization of the debtor.**

The UFCW argues that the bankruptcy court applied the wrong standard of "necessity," and that AppleTree's proposed modifications went beyond what was necessary to permit it to reorganize under the correct standard. The bankruptcy court embraced the definition of "necessary" applied in *Truckdrivers Local 807 v. Carey Transportation Co.*, 816 F.2d 82, 88–90 (2d Cir.1987). There the Second Circuit rejected the test adopted by the Third Circuit in *Wheeling–Pittsburgh Steel Corp. v. United Steelworkers of America*, 791 F.2d 1074, 1088–89 (1986), that in determining necessity a bankruptcy court must focus not on what modifications are necessary to permit the long-term viability of the debtor, but instead "on the somewhat shorter term goal of preventing the debtor's liquidation ...." In *Carey* the Second Circuit, after analyzing the history of § 1113, held that "necessary" should not be equated with "essential" or "bare minimum." 816 F.2d at 89. The Second Circuit also explained that under the Third Circuit's test a debtor would have no room to engage in good faith negotiations. Since any concession from its "bare minimum" proposals would arguably mean that those proposals were not really the bare minimum to stave off liquidation, the debtor's proposals would have to be a "take-it-or-leave-it" ultimatum, not the first step in good faith negotiations. The Second Circuit also concluded that the bare minimum test was inconsistent with

---

27. July 1, 1992, transcript at pp. 100–102 and 112–114.

28. Brief of UFCW at p. 11.

the purpose of allowing a debtor to reject a bargaining agreement, which is to allow the debtor successfully to reorganize. In defining the proper test for necessity the Second Circuit held that "the necessity requirement places on the debtor the burden of proving that its proposal is made in good faith, and that it contains necessary, but not absolutely minimal, changes that will enable the debtor to complete the reorganization process successfully." 816 F.2d at 90.

Like the bankruptcy court, this court concludes that the Second Circuit's test for necessity is more consistent with the history and purpose of § 1113 and with the realities of a reorganization under Chapter 11 than the Third Circuit's "bare minimum" test. As AppleTree points out, creditors are not likely to extend additional funds to a reorganized debtor unless there is a reasonable basis to conclude that the reorganization will be successful and not merely a prelude to another reorganization or a liquidation.

 The UFCW also argues as a factual matter that AppleTree's proposals went beyond necessity because (1) the proposals included a number of non-economic changes to the CBAs, (2) AppleTree "failed to quantify substantial savings from many proposals," [29] and (3) AppleTree failed to articulate the necessity of each of its proposals. To determine whether a debtor's proposed modifications to a CBA are necessary, a court must focus on the total impact of the changes in the debtor's ability to reorganize, not on whether any single proposed change will achieve that result. *In re Royal Composing Room, Inc.*, 848 F.2d 345, 348–49 (2d Cir.1988), *cert. denied*, 489 U.S. 1078, 109 S.Ct. 1529, 103 L.Ed.2d 834 (1989). The bankruptcy court had before it substantial evidence that the effect of AppleTree's proposals would be to lower its labor costs and improve its customer service, and the UFCW does not argue to the contrary.

 In addressing the UFCW's first factual argument, the bankruptcy court found:

> With regard to whether or not non-economic changes are okay, I think they are okay. I think the realities of—based upon what I've heard of the testimony is that not only economic changes are necessary in order for the Debtor to be competitive in what is increasingly a competitive market place. And the evidence is that there are a number of new stores, a number of new lines of stores that are coming into the market, and they do business in a way much different than the Debtor. The Debtor needs to do business in their way in order to be competitive, in order to be efficient and therefore attractive in the market place. So I think the presence of non-economic changes are appropriate and allowable in this case.[30]

Having carefully read the record, this court agrees with this finding by the bankruptcy court. The allegedly non-economic changes complained of by the UFCW were among a number of proposed modifications designed to permit a successful reorganization by reducing AppleTree's labor costs and making it more responsive to customer needs. These modifications were intended to have a direct economic effect on AppleTree's ability to reorganize successfully by lowering its labor costs and improving its level of customer service. For example, the 50/50 hours ratio rule described above had a direct, and negative, effect on AppleTree's labor costs and its level of customer service and, therefore, on its ability to successfully reorganize. The UFCW cites no authority that would preclude the inclusion of changes of this nature in a debtor's proposed modifications to a CBA, and the court knows of no legal or logical impediment to including such changes in a debtor's proposals to modify a CBA.[31]

 Nor is the court persuaded by the UFCW's argument that the bankruptcy

---

**29.** Brief of UFCW at p. 8.

**30.** July 3, 1992, transcript at pp. 149–150.

**31.** Reported decisions reflect that modifications of this nature are not uncommon in a debtor's proposed modifications to a CBA. *See Royal Composing Room*, 848 F.2d at 349–350.

court erred in finding necessity because AppleTree failed to quantify the savings it would achieve from each of its proposed changes and the necessity for each proposed change. AppleTree presented evidence that it would lose millions of dollars a year under its existing CBAs [32] and under the UFCW's proposed modifications [33] and that under either scenario it could not successfully reorganize.[34] Even under AppleTree's proposed modifications, cash available from operations would not be sufficient to pay its labor costs until the 1995 fiscal year.[35]

In some instances, for example, elimination of the 50/50 hours ratio rule, changing the wage progression, and changing holiday qualification, the record references to which the UFCW cites reflect AppleTree's acknowledgement that these changes would result in savings and had been considered in calculating the savings to be achieved by AppleTree's proposals, but that the savings from each of these changes had not been individually calculated.[36] The only savings identified by the UFCW that was not included in the totals reflected on Debtor's Exhibit 50 is the reduction in government expenses (presumably social security taxes) that would necessarily accompany reductions in wages. Other proposed changes cited by the UFCW as possible savings were too speculative to quantify.[37] In the total context of AppleTree's proposals these alleged deficiencies in AppleTree's proof of the necessity of its proposals do not undermine the evidentiary support for the bankruptcy court's finding of necessity. After carefully reviewing the record, this court does not find that the failure of AppleTree to quantify the additional savings it might receive from its proposed modifications, or to establish the necessity for each proposed change, resulted in an abuse of discretion by the bankruptcy court in finding that,

taken as a whole, AppleTree's proposed modifications were necessary.

### III. *Conclusion*

Because the UFCW's appeal of the bankruptcy court's rejection order is not moot or barred by *res judicata*, AppleTree's motion to dismiss this appeal is DENIED. Because this court concludes that the bankruptcy court's legal determinations are correct and its factual findings are not clearly erroneous, the order of the bankruptcy court rejecting the UFCW's CBAs with AppleTree is AFFIRMED.

---

32. Debtor's Exhibit 51.

33. Debtor's Exhibit 52.

34. July 1, 1992, transcript at pp. 22–31.

35. July 1, 1992, transcript at pp. 22–26; Debtor's Exhibit 53.

36. July 1, 1992, transcript at pp. 60–64 and 131–135; Debtor's Exhibit 50.

37. See, e.g., July 1, 1992, transcript at pp. 134–35; elimination of vacation pay accrual for employees who fail to give two-weeks' notice or are terminated for just cause.