# United States Bankruptcy Appellate Panel
## FOR THE EIGHTH CIRCUIT

———

Nos. 00-6076, 00-6077, and 00-6078

———

| | |
|---|---|
| In re: | * |
| | * |
| Family Snacks, Inc., | * |
| | * |
| Debtor. | * |
| | * |
| United Food & Commercial | *   Appeal from the United States |
| Workers Union, Local 211, | *   Bankruptcy Court for the |
| | *   Western District of Missouri |
| Appellant, | * |
| | * |
| v. | * |
| | * |
| Family Snacks, Inc. and | * |
| Official Unsecured Creditors' | * |
| Committee, | * |
| | * |
| Appellees and Cross-Appellants. | * |

———

Submitted: November 9, 2000
Filed: January 31, 2001

———

Before HILL, SCHERMER, and DREHER, Bankruptcy Appellate Panel Judges.

———

DREHER, Bankruptcy Appellate Panel Judge.

This appeal raises two questions of apparent first impression as to the interpretation of § 1113 of the Bankruptcy Code. The first is whether a debtor in a Chapter 11 case can reject a collective bargaining agreement even after it has sold virtually all of its assets. The bankruptcy court held that § 1113 did not permit rejection following such a sale. The second is whether the court's denial of a debtor's application

for leave to reject its collective bargaining agreement results, *ipso facto*, in an assumption of such agreement. The bankruptcy court held that it does not.

The union appeals from the bankruptcy court's ruling on the second issue. Debtor and the Official Unsecured Creditors' Committee cross-appeal from the bankruptcy court's ruling on the first. We reverse the bankruptcy court decision regarding rejection and remand for further proceedings in accordance with this decision. We affirm the bankruptcy court's decision regarding the effect of a denial of an application for leave to reject.

FACTS and PROCEDURAL HISTORY

Family Snacks, Inc. ("Debtor") produces and distributes potato chips and other snack foods. On August 1, 1998, Debtor entered into a collective bargaining agreement ("CBA") with United Food & Commercial Workers Local 211 ("the union"). The CBA was to remain in effect for five years and provided that Debtor would pay certain of its union employees' medical and dental expenses. In late 1999 and early 2000, Debtor was in serious financial difficulty and fell behind in its payments of these expenses. Shortly before filing for bankruptcy, these unpaid employee medical and dental expenses totaled approximately $491,000.[1]

On February 14, 2000, Debtor filed a Chapter 11 bankruptcy petition. It was clear from the beginning that Debtor could not rehabilitate itself. For over six months, Debtor had been attempting to sell this increasingly financially distressed company, with little success. Matters were so bleak that for a time

_____

[1]This number represents an estimate by the union. In addition, on the date of filing, Debtor was in arrears in paying approximately $600,000 in medical and dental expenses for employees represented by other unions and for non-union employees. The parties agree that if the union's claim to administrative expense status for its members' prepetition medical and dental expenses succeeds, the claims of Debtor's other employees, as well as the claims of all other prepetition unsecured creditors, will almost certainly receive no distribution at all.

the company shut down. Nonetheless, one purchaser was willing to sign a letter of intent to purchase, and on February 25, 2000, Debtor moved for expedited hearing and bankruptcy court approval to carry out a sale of virtually all of its assets under § 363 of the Bankruptcy Code. Concurrently therewith, Debtor moved for an order allowing the purchaser to assume or reject executory contracts and leases, including the CBA, as selected by the purchaser. The letter of intent specifically required that the assets would be sold free and clear of certain liabilities, including any arising under union contracts. It was Debtor's position that the value of the assets of the company could be maximized only if its assets were sold on a going concern basis. The bankruptcy court granted expedited hearing and approved a sale pursuant to the letter of intent and set auction procedures, with the auction to occur on March 13.

The union filed an objection to the sale. It also objected to Debtor's motion to assume or reject executory contracts. The union argued that a sale free and clear of Debtor's obligations under the CBA violated § 1113 and that no sale could occur until Debtor had taken steps to bargain with the union. The union sought to delay the sale until such negotiations could take place or to have payment of unpaid prepetition employee medical and dental expenses under the CBA made a condition of the sale. In essence, the union's position was that, no matter how exigent the circumstances, no sale could take place before Debtor dealt with the prepetition claims Debtor had incurred under the CBA. Debtor responded that the court should approve the sale, since failing to do so would dramatically reduce the amount available to pay creditors.

The first purchaser was unable to arrange financing and withdrew its offer. A new purchaser stepped in, however. The new Purchase Agreement continued to specifically provide that the assets would be sold free and clear of Debtor's liabilities under the CBA. On March 22, 2000, over the union's objections, the bankruptcy court issued its order approving the sale to the new purchaser. The court declined to condition the sale on the purchaser's assumption of the CBA. No appeal was taken from that order and the sale closed on March 29, 2000. The next day the purchaser began operations. It did not assume the CBA. Rather, it hired virtually all union members under terms of a new CBA with the new

purchaser that were similar (though not identical) to those in the CBA with Debtor. The purchaser also paid all employees' postpetition medical and dental claims. Thus, as a result of the sale and the Debtor's and the purchaser's actions, all postpetition obligations to union members were fully paid. This left the dispute over the unpaid prepetition medical and dental expenses due under the CBA.

The union had made a motion to have the union employees' prepetition medical and dental expenses treated as an administrative expense. On April 5, when that motion came on for hearing, the bankruptcy judge recused himself from deciding it and a second bankruptcy judge stepped in. By way of order dated April 24, that judge held, without ruling on the merits, that Debtor should be allowed time to negotiate with the union. On April 13, in accordance with § 1113(b)(1)(A) of the Bankruptcy Code, the Debtor had already sent a letter to the union in which it purported to modify the CBA by termination. Debtor noted that, having divested itself of substantially all of its assets, it was not possible to assume the CBA and "thus, the only modification of the CBA that is viable is the termination of that agreement . . . ." Debtor further advised that it intended to file a Chapter 11 plan to deal with its remaining assets and liabilities and to make distributions to creditors in accordance with the priorities established in the Bankruptcy Code. Specifically, Debtor committed to treat union members' prepetition medical and dental expenses as fourth priority expenses under § 507(a)(4) in the plan.

The union rejected Debtor's proposal for termination. The parties continued to negotiate, but were unable to reach an agreement. Thus, on May 1, 2000, Debtor filed an application for leave to reject the CBA. The Official Unsecured Creditors' Committee joined in the application. The bankruptcy court heard Debtor's application for leave to reject, along with the union's still pending motion for an order determining that the unpaid prepetition medical and dental expenses be treated as an administrative expense.

In an order dated June 8, 2000, from which this appeal is taken, the bankruptcy court denied Debtor's application to reject the CBA. The court reasoned that Debtor could not comply with §1113(b)(1)(A) by showing that rejection was "necessary to permit the reorganization of the debtor." The

court construed this language as requiring a debtor to show both that it was reorganizing "with a view to the long run success of the debtor's business" and that "it could emerge from its reorganization as an economically viable operation." While the court appeared to accept the proposition that a debtor who is selling its assets as a going concern may take advantage of § 1113, the court confined § 1113 to instances in which the debtor applied for leave to reject under § 1113 *before* any asset sale:

> Since Family Snacks is not reorganizing, and since, in any event, it now has no employees, rejection of the CBA is not necessary for its reorganization. For this reason, Family Snacks' motion to reject must be denied.

Debtor and the Official Unsecured Creditors' Committee ("Appellees") cross-appeal from this portion of the decision.

The bankruptcy court then dealt with the union's arguments that Debtor had impliedly assumed the contract at the point of sale or, alternatively, that the CBA had been assumed as a matter of law as a result of the court's ruling on Debtor's application to reject. The court ruled that the first argument, that assumption occurred at the time of sale, was foreclosed by the March 22 order allowing the sale, from which no appeal had been taken. The union does not explicitly challenge this portion of the bankruptcy court's order.[2] The union does, however, urge that the bankruptcy court erred when it ruled that denial of

---

[2]The union does make reference to this issue at several points in its appellate briefs but it nowhere addresses the question of whether the March 22 order created the law of the case on this specific question. Such passing references without more substantial development and argument do not bring the issue properly before the appellate court. See, e.g., United States v. Panet-Collazo, 960 F.2d 256, 261 n.3 (1st Cir. 1992) ("It is the 'settled appellate rule that issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation are deemed waived.'" (quoting United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1989), cert. denied, 494 U.S. 1082 (1990)); Larson v. Nutt, 34 F.3d 647, 648 (8th Cir. 1994) ("In any event, Larson's skeletal assertion that 'there were no circumstantial guarantees of trustworthiness surrounding the making of the statements,' buried in a brief point discussing the benefits of cross-examination, does not raise the issue on appeal." (citing United States v. Dubkel, 927 F.2d 955, 956 (7th Cir. 1991)); Branch v. Turner, 37 F.3d 371, 374 (8th Cir. 1994) (citing Laborers' Union of North Am. v. Foster Wheeler Corp., 26 F.3d 375, 398 (3d Cir. 1994) (passing reference to issue without discussion does not bring issue before court). Thus, we decline to address this argument. And, while we do not reach the issue because it has been waived on appeal, we note that the Memorandum Opinion of April 4, 2000, which supported the March 22, 2000

5

an application for rejection did not result, *ipso facto*, in an assumption of the CBA. Here, the court reasoned, in part, that whether covered by § 1113 or § 365, a debtor must take some affirmative action to assume or reject a CBA, and it is only the debtor who can take such action.

In light of its decision that assumption had not yet occurred, the bankruptcy court then determined that the union's motion to treat the unpaid prepetition medical and dental expenses as an administrative expense was still not ripe for decision and denied the union's motion for administrative expense treatment without prejudice.

## ISSUES

The parties raise two issues on appeal. First, was the bankruptcy court correct in concluding that rejection was not an option once an asset sale had occurred because there was no longer a "reorganization" to be facilitated by such rejection? The second issue is whether the bankruptcy court correctly held that no assumption occurred *ipso facto* as a result of the court's order denying Debtor's motion to reject.

## STANDARD OF REVIEW

The appellate court reviews a bankruptcy court's conclusions of law *de novo* and its findings of fact for clear error. See Merchants Nat'l Bank of Winona v. Moen (In re Moen), 238 B.R. 785, 790 (B.A.P. 8th Cir. 1999); Bachman v. Laughlin (In re McKeeman), 236 B.R. 667, 670 (B.A.P. 8th Cir. 1999). This case involves review of the bankruptcy court's conclusions of law–the interpretation of §1113. See Truck Drivers Local 807 v. Carey Transp. Inc., 816 F.2d 82, 88 (2d Cir. 1987) ("The bankruptcy court's interpretation of the statute [11 U.S.C. § 1113], specifically its reading of what the debtor must

---

order, referenced "the union's premise . . . that a sale of substantially all of the debtor's assets as a going concern to an entity who does not intend to honor the CBA constitutes a *de facto* rejection of the CBA and, therefore, the requirements of section 1113 must be met before a sale under those terms can be permitted." In allowing the sale, the court thus appeared to have rejected this argument.

prove before the court may approve rejection, does constitute a conclusion of law subject to plenary review."). Therefore, this court will review the bankruptcy court's decision *de novo*.

## DISCUSSION

A.     Rejection Following an Asset Sale

We first address Appellees' contention that the bankruptcy court erred in its ruling that, as a matter of law, once the asset sale occurred, Debtor could not commence the process of rejection under § 1113. The court reasoned that § 1113 restricts a debtor to modifications that are necessary to the reorganization of the debtor and proposals must be made with a view towards the long term continuation of the business. Because Debtor had closed its doors, the court held it could not meet this threshold requirement. Because Debtor had already sold its assets, it also could not establish that rejection was necessary to facilitate the sale of the business on a going concern basis. Thus, in a liquidating Chapter 11 case, the court found, rejection is not an available alternative unless a debtor complies with § 1113 *before* it accomplishes a sale of all its assets. We find this reading of the statutory language too narrow, and we reverse.

Generally speaking, § 1113 governs the rejection or modification of a CBA by a Chapter 11 trustee or debtor-in-possession. See 11 U.S.C. § 1113(a) (1994) ("The debtor in possession, or the trustee ... may assume or reject a collective bargaining agreement only in accordance with the provisions of this section."). This section has its roots in the Supreme Court's decision in NLRB v. Bildisco & Bildisco, 465 U.S. 513 (1984). In Bildisco, the Supreme Court held that a debtor's CBA was an executory contract which could be rejected under § 365 of the Bankruptcy Code so long as it appeared that rejection was necessary to the debtor's reorganization and the equities favored such rejection. See Bildisco, 465 U.S. at 526-27. The Bildisco Court also ruled that the debtor would have to establish that it had made efforts to negotiate with the union prior to attempting to reject the CBA. See id. at 526. This portion of the court's decision was noncontroversial. The second portion of the opinion was, however, very

7

controversial. The Court held that a debtor could unilaterally reject a CBA without court approval and not commit an unfair labor practice under § (8)(d) of the NLRA.[3] See id. at 523-27. Congress swiftly responded to this second portion of the decision by enacting § 1113 of the Bankruptcy Code. See Collier on Bankruptcy ¶ 1113.01 (Lawrence P. King ed., 15th rev. ed. 1999). With § 1113, Congress clearly manifested its intent that CBAs be treated differently than other executory contracts with respect to rejection. Section 1113 specifically sets forth the standards and procedure for rejection of a CBA and makes clear that a debtor may not unilaterally reject a CBA. Given this legislative history, it is often said that § 1113 is designed "to prevent [the debtor] from using bankruptcy as a judicial hammer to break the union." New York Typographical Union No. 6 v. Maxwell Newspapers, Inc. (In re Maxwell Newspapers, Inc.), 981 F.2d 85, 89 (2d Cir. 1992). See also Jones Truck Lines, Inc. v. Central States, Southeast & Southwest Areas Pension Fund (In re Jones Truck Lines, Inc., 130 F.3d 323, 330 (8th Cir. 1997) ("Section 1113(f) was designed to prevent employers 'from using bankruptcy as an offensive weapon to rid themselves of burdensome collective bargaining agreements.'" (quoting In re Ionosphere Clubs, Inc., 22 F.3d 403, 408 (2d Cir. 1994)).

Section 1113 contains detailed substantive and procedural requirements with which a debtor must comply to modify or reject a CBA. Specifically, § 1113(c)(1) provides the criteria a court must use in evaluating the debtor-in-possession's application to reject a CBA:

> (c) The court shall approve an application for rejection of a collective bargaining agreement only if the court finds that–
> > (1) the trustee has, prior to the hearing, *made a proposal that fulfills the requirements of subsection (b)(1);*
> > (2) the authorized representative of the employees has refused to accept such proposal without good cause; and
> > (3) the balance of the equities clearly favors rejection of such agreement.

11 U.S.C. § 1113(c) (1994) (emphasis added). Section 1113(b)(1), which is cross- referenced in Subsection (c)(1), sets out the requirements for making a valid proposal to modify:

---

[3]Section 8(d) of the NLRA, 29 U.S.C. § 158(d) (1994), prohibits either party to a labor contract from unilaterally changing its terms and conditions during the life of the agreement.

8

(b)(1) Subsequent to filing a petition and prior to filing an application seeking rejection of a collective bargaining agreement, the debtor in possession or trustee . . . shall

    (A) make a proposal to the authorized representative of the employees covered by such agreement, based on the most complete and reliable information available at the time of such proposal, which provides for those necessary modifications in the employees benefits and protections that are *necessary to permit the reorganization of the debtor* and assures that all creditors, the debtor and all of the affected parties are treated fairly and equitably; and

    (B) provide . . . the representative of the employees with such relevant information as is necessary to evaluate the proposal.

11 U.S.C. § 1113(b)(1) (1994) (emphasis added). Nowhere in § 1113 is there any indication as to when a debtor must take action to reject a CBA. Timing is addressed, however, in Subsection (b)(2) which requires the trustee or debtor-in-possession to meet with the union representative and "confer in good faith in attempting to reach mutually satisfactory modifications" of the CBA between the time the debtor makes the proposal and the hearing date. 11 U.S.C. § 1113(b)(2) (1994). Subsection (d) further enumerates timing requirements once such an application is made, providing that a hearing shall be held within fourteen days of the filing of the application and that the bankruptcy court must rule on an application for rejection within thirty days after the hearing. See 11 U.S.C. § 1113(d)(1)-(2) (1994). Subsection (e) allows for interim modifications by court order where "essential to the continuation of the debtor's business, or in order to avoid irreparable damage to the estate . . . ." 11 U.S.C. § 1113(e). And Subsection (f), specifically overruling the controversial portion of Bildisco, provides: "No provision of this title shall be construed to permit a trustee to unilaterally eliminate or alter any provision of a collective bargaining agreement prior to compliance with the provisions of this section." 11 U.S.C. § 1113(f) (1994).

Section 1113 is certainly "not a masterpiece of draftsmanship." In re American Provision, 44 B.R. 907, 909 (Bankr. D. Minn. 1984). Courts and scholars alike have commented extensively on how poorly-drafted this statutory provision is. See, e.g., In re Mile Hi Metal Sys., Inc., 899 F.2d 887, 890 (10th Cir. 1990); Birmingham Musicians' Protective Ass'n v. Alabama Symphony Ass'n (In re Alabama Symphony Ass'n), 211 B.R. 65, 69 (D.N.D. Ala. 1996) ("The drafters of § 1113, however, were not as clear as they might have been, and the interpretation of the law has not been consistent among the courts that have

examined the section." (internal footnote omitted)); In re Moline Corp., 144 B.R. 75, 78 (Bankr. N.D. Ill. 1992) (noting that Congress' drafting failed to make clear § 1113's relationship to other provisions of the Bankruptcy Code); David Keating, *The Continuing Puzzle of Collective Bargaining Agreements in Bankruptcy*, 35 WM. & MARY L. REV. 503, 505 (1994) [hereinafter Keating] ("After nearly a decade and dozens of cases, the debate concerning section 1113 is far from settled. Neither the courts nor scholars can agree about what Congress intended to accomplish with section 1113. Similarly, courts still have not arrived at a consensus concerning how they ought to interpret that section's nebulous standards for allowing a Chapter 11 company's rejection of a collective bargaining agreement."); Mitchell Rait, *Rejection of Collective Bargaining Agreements Under Section 1113 of the Bankruptcy Code: The Second Circuit Enters the Arena*, 63 AM. BANKR. L.J. 355, 357 (Fall 1989) [hereinafter Rait]. In addition, Congress provided courts with no meaningful legislative history to decipher and clarify Congressional intent or to interpret and apply the statute's substantive, often ambiguous, terms. See generally United Food & Commercial Workers Union, Local 770 v. Official Unsecured Creditors' Commit. (In re Hoffman Bros. Packing Co., Inc.), 173 B.R. 177, 182 (B.A.P. 9th Cir. 1994) ("[Enactment of § 1113 in response to Bildisco] was not a tidy process. Passage of § 1113 was not accompanied by a committee report, and there is no dependable legislative history."); Collier on Bankruptcy ¶ 1113.LH (Lawrence P. King ed., 15th rev. ed. 1999) (noting absence of co-sponsor statements and committee reports on § 1113); In re Mile Hi Metal Sys., Inc., 899 F.2d at 890 ("When legislative history is scant and capable of differing interpretations, we are hesitant to consider it a reliable indicator of [Congressional] intent." (internal citations omitted) (alterations in original)); Rait, *Rejection of Collective Bargaining Agreements*, 63 AM. BANKR. L.J. at 356 (commenting that because "legislative history is sparse and provides no guidance in interpreting the provisions," courts have been left to ferret out § 1113's meaning and reached widely divergent results in doing so).

As a consequence, courts differ in their application and interpretation of § 1113. They do, however, seem to agree that an application to reject a CBA under § 1113 is judged against a nine factor test first articulated in In re American Provision Co., 44 B.R. 907, 909 (Bankr. D. Minn. 1984). See

generally Keating, 35 WM. & MARY L. REV. at 511-12 ("Virtually every court that is faced with the issue of whether a Chapter 11 debtor may reject its collective bargaining agreement utilizes a nine-part test that was first set down by the bankruptcy court in In re American Provision Co."). Under § 1113(b), the American Provision test requires that: (1) the debtor make a proposal to modify the CBA; (2) the proposal be based on the most complete and reliable information available at the time of the proposal; (3) the proposed modifications are necessary to permit reorganization of the debtor; (4) the modifications assure that all creditors, the debtor, and all other affected parties are treated fairly and equitably; (5) the debtor provides to the union such relevant information as is necessary to evaluate the proposal; (6) the debtor meets at reasonable times with the union between the time of the proposal and the time of the hearing on the proposal; (7) the debtor negotiates with the union in good faith at these meetings; (8) the union refuses to accept the debtor's proposal without good cause; and (9) the balance of equities clearly favors rejection of the agreement. See American Provision, 44 B.R. at 909. In terms of burdens, the "debtor bears the burden of persuasion by the preponderance of the evidence on all nine elements," although "assignment of the initial burden of production depends on the circumstances." Id.

The third factor, "necessary to permit the reorganization of the debtor," which was central to the bankruptcy court's decision, has been at the root of numerous disputes as to interpretation. The primary dispute arises in the context of how to interpret the word "necessary." Basically, courts differ as to whether "necessary" is synonymous with "essential" or has a more flexible meaning.

On the one side is the Third Circuit and its decision in Wheeling-Pittsburgh Steel Corp. v. United Steel Workers of America, 791 F.2d 1074 (3d Cir. 1986). There, the court defined "necessary" as synonymous with "essential." Id. at 1088-94. See also In re Royal Composing Room, Inc., 62 B.R. 403, 417-18 (Bankr. S.D.N.Y. 1986) (discussing Third Circuit's strict "necessary" standard); In re Pierce Terminal Warehouse, Inc., 133 B.R. 639, 646-47 (Bankr. N.D. Iowa 1991) (adopting strict construction of "necessary to permit reorganization"). Interpreting "necessary" strictly, the Third Circuit "claimed that Congress intended the word 'necessary' to focus on the somewhat shorter-term goal of preventing the

11

debtor's liquidation rather than on the far-sighted goal of ensuring a long-term reorganization." Keating, 35 WM. & MARY L. REV. at 527 (citing Wheeling-Pittsburgh, 791 F.2d at 1089).

On the other side is the Second Circuit and its decision in Truck Drivers Local 807 v. Carey Transportation, Inc., 816 F.2d 82 (2d Cir. 1987). There, the Second Circuit defined "necessary" more broadly. See id. at 90. Rejecting the Third Circuit's strict interpretation, the Second Circuit concluded that "the necessity requirement places on the debtor the burden of proving that its proposal is made in good faith, and that it contains necessary, but not absolutely minimal, changes that will enable the debtor to complete the reorganization process successfully." Id. Thus, this more flexible Carey standard "focuse[s] on changes that w[ill] ensure the long-term health of the debtor rather than on changes that would simply stave off a liquidation in the short term." Keating, 35 WM. & MARY L. REV. at 527-28. See also United Food and Commercial Workers Union, Local 328 v. Almac's, Inc., 90 F.3d 1, 5, 6 (1st Cir. 1996) (differentiating between the standard for interim changes in § 1113(e) and rejection in § 1113(b) and pointing out that the latter involves substantive "modifications proposed with a view to the long-run success of the debtor's business"). This more flexible standard is often paired with the requirement of §1129(a)(11) that a plan of reorganization be confirmed only if confirmation is not likely to be followed by the liquidation of, or the need for further financial reorganization of, the debtor. See 11 U.S.C. § 1129(a)(11); see also Almac's, 90 F.3d at 6.

However, each court that has addressed the meaning of the phrase "reorganization of the debtor," as found in § 1113(b)(1)(A), has held or assumed that § 1113 applies in a case where the debtor will not be engaged in business because it is selling its assets. Initially this might seem questionable since, overall, the language and scheme of things suggests Congress was concentrating on the classic form of reorganization where the debtor restructures its debts and continues in business. See In re Ionosphere Clubs, Inc., 134 B.R. 515, 517 (Bankr. S.D.N.Y. 1991) (discussing problematic application of § 1114's "necessary to permit the reorganization of the debtor" language to liquidating Chapter 11 cases). But nonetheless, the courts have applied § 1113 in a liquidation scenario. See In re Maxwell Newspapers,

12

Inc., 981 F.2d at 91 ("The union . . . contends that the debtor has not shown that a collective bargaining agreement may be rejected to serve the interests of a purchaser of assets. The two lower courts believed that 11 U.S.C. § 1113 applied to this transaction because what is to emerge, if the sale is consummated, is the Daily News reorganized as an ongoing business. We agree."); In re Hoffman Bros. Packing, 173 B.R. at 186-87 ("[T]he distinction between reorganization of a debtor and the sale of a going concern asset to a third party . . . [is] irrelevant to considerations under § 1113, based on Chapter 11's goal of continuing the enterprise, regardless of the ownership."); In re The Lady H Coal Co., 193 B.R. 233, 240-43 (Bankr. S.D. W. Va. 1996) (denying a debtor's application for rejection on equitable grounds but assuming that rejection may occur to facilitate a sale); In re Buhrke Indus., Inc., No. 94-B-1671, 1996 WL 520771, at *1 (Bankr. N.D. Ill. Sept. 13, 1996) (allowing a debtor to reject a CBA while the debtor was in the process of liquidation); see also Collier on Bankruptcy ¶ 1113.02[1] (Lawrence P. King ed., 15th rev. ed. 1996) (stating that § 1113 "applies to chapter 11 cases whether the proposed plan is a liquidating one or not") (citing In re Moline Corp., 144 B.R. 75 (Bankr. N.D. Ill. 1992)).[4]

The bankruptcy court never reached the question of which standard to apply when deciding whether rejection was "necessary" because it interpreted "reorganization" narrowly. The court provided little guidance for its decision, but did reference In re Mile Hi Metal Systems, Inc., 899 F.2d at 893 (placing on the debtor the burden of proving that it could emerge from its reorganization as an economically viable operation to permit modification or rejection of the CBA), and Almac's, 90 F.3d at 6 (stating that proposals to modify or terminate a CBA "must be made with a view to the long run success of the debtor's

---

[4]The bankruptcy court in In re Ionosphere Clubs, Inc., 134 B.R. 515, 516-17 (Bankr. S.D.N.Y. 1991), grappled with the application of similar language in § 1114 to a liquidation case. See 11 U.S.C. § 1114(f)(1)(A). There, the court noted that "it is evident from the statute itself that Congress glossed over the fact that while Chapter 11 cases are usually nonliquidating rehabilitative reorganizations, this is not always, or necessarily, the case. Where a moribund debtor ... is liquidating under Chapter 11, 'necessary to permit the reorganization of the debtor,' construed literally, does not provide a meaningful standard for this Court to apply." Id. at 522. Nonetheless, the court applied § 1114 in a case where the debtor had liquidated.

13

business").[5]  Since Debtor had already sold its assets before it sought court approval for its rejection, the bankruptcy court held that rejection was not an available remedy.

We begin by noting that this precise question, whether a debtor must comply with § 1113 before it sells its assets, appears to be one of first impression. We find no case directly on point as to this issue of timing under § 1113.[6]  The bankruptcy court's reliance on Almac's and Mile Hi, therefore, was misplaced. Those cases dealt with the meaning of "necessary," not the meaning of "reorganization of the debtor."

_____

[5]The court also cited Carpenters Health & Welfare Trust Funds for California v. Robertson (In re Rufener Construction, Inc.), 53 F.3d 1064 (9th Cir. 1995) which deals solely with the question of whether § 1113 is available to a debtor whose Chapter 11 case has been converted to Chapter 7.

[6]The courts in two cases *assume* a debtor may proceed with the requirements of § 1113 for modification of the CBA post-asset sale. See In re The Lady H Coal Co., Inc., 193 B.R. 233, 240-41 (Bankr. S.D. W. Va. 1996); Tool & Die Makers Local Lodge 113 v. Buhrke Inds., Inc., No. 94-C-5728, 1996 WL 131698, at *4, *6 n.12 (D.N.D. Ill. 1996). However, neither case addresses the precise timing issue raised in this case. In Buhrke, for example, over the union's objection, the debtor sold the assets of its tool and die division and closed its doors. Buhrke, 1996 WL 131698, at *2. The debtor proposed a plan of reorganization under which union employees' unpaid pre-petition vacation benefits would be treated as third priority allowed unsecured claims under § 507(a)(3)(A). See id. at **2-3. The union objected, arguing that benefits should be given administrative expense priority and that the failure to treat them as such constituted a prohibited unilateral modification of the CBA under § 1113(f). The district court rejected the union's argument. See id. at **4-6. More relevant to the issue in this case, however, the bankruptcy court below had held that the debtor had not assumed the CBA when the company's assets were sold and rejected the union's argument that once an asset sale had occurred, rejection of the CBA was not an option. See id. at *7. Finding that the bankruptcy court failed to address all factors of the American Provision test, the district court never reached this issue but did not seem bothered by the idea that rejection of the CBA could occur post-sale: "[T]he debtor no longer employs any members of Local 113, and therefore assumption of the CBA (the logical opposite of rejection) would serve no business purpose." Id. at *10 n.11.

Likewise, in Lady H, the debtor sought to reject its CBA and proceed with a sale of substantially all of its assets free and clear of any interest or liabilities under that CBA. See Lady H, 193 B.R. 236. The court rejected the debtor's application to reject, finding that the debtor had failed to comply with some of the American Provision factors. See Lady H, 193 B.R. at 242-43. However, the court approved the asset sale. See id. at 245. Thus, the court's decision in Lady H implicitly suggests that the debtor could satisfy the requirements of § 1113 after an asset sale but prior to confirmation of a plan. But, as in Buhrke, the Lady H court never explicitly addressed or discussed that issue.

14

When they used language regarding the long term future of the business, they did so to make clear that they were not adopting the more narrow, minimally needed to avoid liquidation, test adopted in Wheeling-Pittsburgh. Neither case involved a debtor who was liquidating.[7] For the reasons set forth below, we find that the court, based on apparent misreading of inapplicable cases, too narrowly read the word "reorganization" and erred when it equated reorganization as used in § 1113 with rehabilitation of the debtor.

As a threshold matter, Congress used the word "reorganization," not the more narrow term "rehabilitation," in § 1113(b)(1)(A). While "reorganization" is not a statutorily defined term, it is generally understood to include all types of debt adjustment, including a sale of assets, piecemeal or on a going concern basis, under § 363 followed by a plan of reorganization which distributes the proceeds of the sale to creditors in accordance with the Bankruptcy Code's priority scheme. See, e.g., 11 U.S.C. §1123(b)(4) (1994) (stating that a plan may "provide for the sale of all or substantially all of the property of the estate, and the distribution of the proceeds of such sale among holders of claims or interests"); In re Timbers of Inwood Forest Assocs., Ltd., 808 F.2d 363, 371 n.14 (5th Cir. 1987) (finding that § 362(d)(2) "necessary to an effective reorganization" includes liquidation), aff'd, 484 U.S. 365 (1988); In re Bloomingdale Partners, 155 B.R. 961, 988 (Bankr. N.D. Ill. 1993); In re Independence Village, Inc., 52 B.R. 715, 723 (Bankr. E.D. Mich. 1985); In re W.S. Sheppley & Co., 45 B.R. 473, 480 (Bankr. N.D. Iowa 1984). Indeed, elsewhere in the Bankruptcy Code, Congress has distinguished the narrower concept of

[7]The union refers us to a number of additional cases for the proposition that "reorganization" as used in § 1113(b)(1)(A) has been interpreted to mean emergence from bankruptcy as a viable, ongoing enterprise. See Truck Drivers Local 807 v. Carey Transp., Inc., 816 F.2d 82 (2d Cir. 1987); United Food & Commercial Workers v. Appletree Markets (In re Appletree Markets, Inc.), 155 B.R. 431 (D.S.D. Tex. 1993); In re Valley Steel Prod., Inc., 142 B.R. 337 (Bankr. E.D. Mo. 1992). Again, these cases are inapposite for they deal with the separate question of the standard to be used when determining the meaning of the word "necessary" as used in § 1113(b)(1)(A). None of them discusses the meaning of the word "reorganization" and none was decided in a factual context in which the debtor was liquidating its assets.

rehabilitation from the broader concept of reorganization. <u>See</u> <u>In re Economy Cab & Tool Co., Inc.</u>, 44 B.R. 721, 724 n.2 (Bankr. D. Minn. 1984) ("It is well established that the 'rehabilitation' of the second element under Section 1112(b)(1) means something more than 'reorganization' as 'reorganization' may include orderly liquidation under control of debtor."); <u>see</u> <u>also</u> 11 U.S.C. § 1113(e) (providing for interim modification of a CBA "if essential to the continuation of the debtor's business, or in order to avoid irreparable damage to the estate"); <u>Almac's</u>, 90 F.3d at 6 ("The scope of 'interim changes' [in § 1113(e) which speaks of 'essential to the continuation of the debtor's business'] is more limited than the modifications 'necessary for reorganization.'").

In addition, we note that the bankruptcy court's conclusion that there is a time limit on when in the reorganization process a debtor must reject a CBA (i.e., it must be made before rather than after an asset sale) is not supported by any language found in § 1113.   As previously noted, there is nothing in the language of § 1113 that dictates when an application to reject must be made. <u>See</u> <u>generally</u> <u>In re Moline Corp.</u>, 144 B.R. 75, 77-78 (Bankr. N.D. Ill. 1992).  Accordingly, for reasons discussed *infra*, the timing of such action is governed, not by § 1113, but by § 365(d)(2), which allows a debtor to defer such a decision until confirmation of a plan.[8]  <u>Id.</u>

---

[8]A debtor may not, however, fail to take steps to reject the CBA under § 1113 and, at the same time, fail to comply with the terms of the CBA.  A debtor remains bound by the terms of the CBA until it takes affirmative steps to reject that agreement. <u>See</u> <u>In re Manor Oak Skilled Nursing Facilities</u>, 201 B.R. 348, 350 (Bankr. W.D.N.Y. 1996) ("[A]ll aspects of a collective bargaining agreement remain in effect until rejection occurs, including the duty to cure pre-petition arrears or suffer the consequences.  The Debtor here wants both the benefits of rejection (the ability to impair the pre-petition arrears) and benefits of assumption (labor peace) at the same time.  It may not have its cake and eat it too." (citing <u>In re Golden Distrib., Ltd.</u>, 134 B.R. 760, 762 (Bankr. S.D.N.Y. 1991)).  In addition, a debtor may not unilaterally modify or reject a CBA; rather, under the terms of § 1113, it must, *inter alia*, negotiate such modifications with the union representative and ultimately seek court approval for such modifications. <u>See</u> 11 U.S.C. § 1113(f) ("No provision of this title shall be construed to permit a trustee to unilaterally terminate or alter any provisions of a collective bargaining agreement prior to compliance with the provisions of this section.").

Moreover, and most importantly, identical wording in § 1114 of the Bankruptcy Code has been interpreted to include a situation where the debtor first seeks to reject after it has sold its assets. Section 1114 was enacted in 1988 and deals with retiree benefits, including those found in a union bargaining agreement. It allows a Chapter 11 debtor to modify retiree benefits under the same test set forth in § 1113: if "necessary to permit the reorganization of the debtor." 11 U.S.C. § 1114(g)(3) (1994). In In re Ionosphere Clubs, Inc., 134 B.R. 515, 517 (Bankr. S.D.N.Y. 1991), the bankruptcy court rejected an argument that "once a company gives up hope of reorganizing as a viable entity, retiree benefits can no longer be modified." Eastern Airlines was well into a liquidation of all of its assets before it sought to modify its obligations of providing benefits for retirees. The bankruptcy court reasoned:

> If the motion to modify or terminate the benefits is not heard before any possibility of reorganization is lost, then according to the Retiree Committee, the trustee would be unable to meet this "necessary to" test and would, thereafter, have forfeited any opportunity to modify retiree benefits in any way. This Court cannot find that Congress intended such an anomalous result. Under the circumstances of this case, the only meaningful interpretation of "necessary to permit the reorganization" that is consistent with fair and equitable treatment of retirees and all other creditors is one that does not encourage the Trustee or the Creditors' Committee to seek to convert the case from Chapter 11 to Chapter 7 solely to preserve the possibility of some recovery for general unsecured creditors. In other words, in this liquidating case, "necessary to permit the reorganization" must be interpreted to mean "necessary to accommodate confirmation of a Chapter 11 plan."

Ionosphere, 134 B.R. at 524-25. While Ionosphere deals with a different statutory section, we are persuaded by these arguments and find them equally applicable to the same wording found in § 1113. See S. REP. NO. 1119, at 6 (1988), reprinted in 1988 U.S.C.C.A.N. 687-88 ("These standards [§ 1114(e) and (g)] are intended to be identical to those contained in Section 1113. In adopting this standard the Committee believes that it is important to use a standard with which the courts are already familiar."); Ionosphere, 134 B.R. at 519 ("When Congress enacted § 1114 it used the same procedures and standards as existed for modification or rejection of collective bargaining agreements under § 1113. Compare 11 U.S.C. §§ 1113(b) and (c) with 11 U.S.C. § 1114(e) and (g) respectively.").[9]

---

[9]The union has suggested that the decision in Maxwell Newspapers overruled Ionosphere. Compare In re Maxwell Newspapers, Inc., 981 F.2d 85 (2d Cir. 1992), with In re Ionosphere Clubs,

The union seeks to confine Ionosphere to its facts, i.e., to a case where the debtor was selling its assets off piecemeal. When a debtor is selling on a going concern basis, the union urges, Ionosphere should not apply because the only meaningful time the court can make a decision on rejection is prior to the sale. We see no basis for such a distinction, unless it is to give the union veto power over a going concern sale which, as we know from experience, is often the best way to reap the greatest benefit for all creditors. Section 1113 was never intended to give unions such power. Its sole purpose is to keep a debtor from unilaterally rejecting a CBA and to plainly articulate the rules for going about rejection. If, as Ionosphere concluded, a debtor who is liquidating piecemeal should not be forced into Chapter 7 in order to preserve its assets for equitable distribution to all creditors, the same is true for a debtor who is selling its assets on a going concern basis.

We further note that there are practical problems with the union's position that negotiations for rejection must occur before a sale. Many times § 363 asset sales occur on a very expedited basis in Chapter 11, and, at times, the court authorizes a sale by auction. Purchasers often are willing to purchase only if the sale can be closed with lightning speed. In an auction setting, for sure, negotiations for rejection would be virtually impossible. In certain factual settings, the union's position would make it impossible for a debtor to accept the highest and best offer for its assets and would precipitate the loss of potential purchasers to the detriment of all other creditors. It is difficult to accept the argument that § 1113 was designed to give a union the power to so strangle a debtor's attempts to reorganize through liquidation.

Thus, while we find no case directly on point, we conclude that "necessary to permit the reorganization of the debtor" means necessary to accommodate confirmation of a Chapter 11 plan. We see no principled reason to limit a debtor's right to reject a CBA to a case where the application to reject

---

Inc., 134 B.R. 515 (Bankr. S.D.N.Y. 1991). On the contrary, Maxwell Newspapers did not explicitly or implicitly overrule or limit the Ionosphere decision. The two cases are factually and legally dissimilar. In addition, in In re Ames Department Stores, Inc., 76 F.3d 66, 68 (2d Cir. 1996), the Second Circuit cited the Ionosphere decision, specifically Chief Bankruptcy Judge Lifland's take on courts' conflicting interpretations of § 1114, favorably.

comes before an asset sale.  Certainly, if it is appropriate to permit rejection in the context of a § 363 asset sale when the debtor will no longer be in business, as the cases uniformly hold and the union appears to concede, it ought not matter when the decision on rejection is made.

The union's argument-that the asset sale constitutes the debtor's "reorganization"-too narrowly reads the language of § 1113(b)(1)(A).  The union cites several cases for the proposition that because an asset sale effectively represents a plan of reorganization, the debtor must satisfy the requirements of § 1113 at the time of or in conjunction with that asset sale.  See, e.g., In re Maxwell Newspapers, 981 F.2d at 91; Hoffman Bros. Packing, 173 B.R. at 186-87; Lady H, 193 B.R. at 240-41.  Admittedly, depending on the facts in a case and the specifics of the arrangement with the prospective purchaser, the asset sale, as these cases suggest, may represent the appropriate time for the debtor to comply with § 1113's requirements and seek rejection of the CBA.  However, these cases are at odds with the accepted principle that an asset sale does not always constitute a plan of reorganization and distribution, see Pension Benefit Guar. Corp. v. Braniff Airways, Inc. (In re Braniff Airways, Inc.), 700 F.2d 935, 940 (5th Cir. 1983), and none of these cases holds that § 1113's requirements may not be satisfied post-asset sale.

The Debtor was not required to reject the CBA prior to or in conjunction with the asset sale under § 1113.  That is to say, exactly when a debtor satisfies the "necessary to permit the reorganization" element does not hinge on the consummation of the asset sale but rather on the confirmation of the actual plan of reorganization to distribute the proceeds of that asset sale.  In this case, at the time the sale closed, Debtor had not yet proposed its plan of reorganization.  Under the terms of the statute, Debtor will still ultimately have to show that rejection of the CBA is necessary to obtain a confirmable Chapter 11 plan.  Because the Debtor can make that showing before, at, or after the asset sale, and thereby satisfy the requirements for rejection of the CBA, § 1113 should not be read to preclude the Debtor from doing so after the § 363 asset sale in this case.

19

Finally, we reject the union's contention that our construction of the statute renders meaningless the protections provided union members in § 1113. According to the union, our construction of § 1113(b)(1)(A) allows a debtor undertaking a going concern sale to ignore its obligations under § 1113 until after it has sold its assets. We disagree. In order to reject a CBA a debtor must prove that it has met each of the nine American Provision factors, including specifically that it is acting in good faith and that the balance of equities favors rejection. See Lady H, 193 B.R. at 242 (denying rejection following sale of assets upon finding that debtor made no effort to find a buyer who would negotiate with the union, appeared to have ignored a potential purchaser who was willing to negotiate with the union, and obligated itself to a "sweetheart" deal for the benefit of insiders). Thus, if a debtor has acted in bad faith in failing to seek rejection of its CBA before a sale, it will not be able to make a threshold showing necessary to obtain the right to modify or reject. If, following the sale, the balance of equities does not favor rejection, the debtor will not be able to reject. But, that does not mean that, as a matter of law, the debtor must apply for rejection of a CBA prior to a sale of its assets.

Accordingly, we reverse and remand to allow the bankruptcy court to make the findings necessary to determine whether Debtor is entitled to reject its CBA.[10] See Buhrke, 1996 WL 131698, at **9-10 (remanding to bankruptcy court for consideration of American Provision factors); see also In re Buhrke Indus., Inc., No. 94-B-1671, 1996 WL 520771, at *1 (Bankr. N.D. Ill. 1996) (decision on remand).

---

[10]We reject Appellees' argument that remand is not necessary because the union conceded all other issues. Appellees point to the transcript of the May 11, 2000 hearing on the Debtor's Application for Leave to Reject. While the subject was touched upon, there was no unequivocal waiver with respect to the other eight American Provision factors. In fact, Appellant has provided us with a memorandum it filed with the bankruptcy court in which it argued that several of the other eight factors had not been established.

B.    Automatic Assumption Upon Denial of the Application to Reject

The second issue on appeal, which we also find to be one of apparent first impression,[11] is whether the bankruptcy court correctly held that no assumption occurred automatically upon the bankruptcy court's denial of Debtor's application to reject. The bankruptcy court rejected the union's argument that assumption occurs upon the bankruptcy court's denial of a debtor's motion to reject, reasoning that assumption may not be implied and that, instead, assumption of the CBA by a debtor required affirmative action by way of a motion seeking assumption. The issue is important because the parties seem to agree that, if assumption occurred, the union employees' claims for prepetition medical and dental expenses will be elevated from unsecured prepetition claims, subject at most to fourth priority under § 507(a)(4), to first priority administrative expenses under §§ 365(b)(1), 365(g)(1), 503(b)(1), and 507(a)(1). In that case, the Debtor is unlikely to have enough money to pay administrative expenses and will not be able to confirm a plan. Given the importance of this issue, which may arise once again on remand, we reach it on appeal.

1.    Incorporation of § 365 Into § 1113

Section 1113 provides the "debtor in possession, or the trustee . . . may assume or reject a collective bargaining agreement only in accordance with the provisions of this section." 11 U.S.C. §1113(a) (1994). The union asserts this plainly means that § 1113 trumps all other Bankruptcy Code sections with respect to both assumption and rejection and that Congress could have, and indeed would have, specifically incorporated other Code sections into § 1113 by reference had it wanted them to apply. However, aside from this single use of the word "assume," § 1113 provides no guidance for what

---

[11]We acknowledge that in Lady H, the court denied the debtor's application to reject the CBA and proceeded to grant the union employees' benefit claims administrative expense status. See Lady H, 193 B.R. at 249. The court seemed to assume that automatic assumption upon the court's denial of the debtor's application to reject was the correct result, and the parties in that case do not appear to have argued otherwise. But because the court never addressed this precise issue, we treat it as one of first impression.

procedure is to be used to assume a CBA, nor against what standards a debtor's attempt to assume should be judged. Rather, § 1113 is entitled "Rejection of Collective Bargaining Agreements" and sets forth detailed requirements relating solely to a debtor's rejection action.

We recognize that as a general rule, fundamental rules of statutory construction require us to adhere to the plain meaning of the statute and give meaning to every word in the statutory provision. See, e.g., Negonsott v. Samuels, 507 U.S. 99, 104 (1993); United States v. Ron Pair Enter., Inc., 489 U.S. 235, 243 (1989); Jasa v. Millard Public Sch. Dist. No. 17, 206 F.3d 813, 815 (8th Cir. 2000). Yet, we find the use of the word "assume" in § 1113, without any additional instruction or reference, far from plain. We are not alone. See, e.g., Massachusetts Air Conditioning & Heating Corp. v. McCoy, 196 B.R. 659, 662 (D. Mass. 1996) ("I find that the use of the term assumption in § 1113(a) was at most sloppy legislative drafting.").

Given the lack of clarity in this specific provision, we must look to other provisions in the Bankruptcy Code for clarification. See United Sav. Ass'n v. Timbers of Inwood Forest Assocs., Ltd., 484 U.S. 365, 371 (1988) ("Statutory construction, however, is a holistic endeavor. A provision that may seem ambiguous in isolation is often clarified by the remainder of the statutory scheme–because the same terminology is used elsewhere in a context that makes its meaning clear[.]"); Jewel Recovery, L.P. v. Gordon, 196 B.R. 348, 352 (D.N.D. Tex. 1996); David v. Fechtel, 150 F.3d 486, 488 (5th Cir. 1998) ("When interpreting a statute, we first look to its plain language. Specific words within a statute, however, may not be read in isolation of the remainder of that section or the entire statutory scheme." (internal quotes and citations omitted)); Finney v. Smith, 141 B.R. 94, 103 (D.E.D. Va. 1992) ("Title 11's various provisions should not be viewed in isolation. Instead, their interpretation should reflect the interplay between all of its different parts, so that the Bankruptcy Code can operate as a coherent whole."); see also Molitor v. Eidson, 76 F.3d 218, 220 (8th Cir. 1996); In re Hasse, 246 B.R. 247, 253 (Bankr. E.D. Va. 2000) ("Statutes sometimes speak in generalities or contradictions, and when they do, it is unavoidable that courts will have to fill in gaps in such a way as seems consistent with the overall framework of the statute.").

22

Moreover, in light of <u>Bildisco</u>'s direction, not disturbed by the enactment of § 1113, that CBAs are executory contracts, the better reading is that § 365 covers assumption and rejection of CBAs, except as specifically modified with regard to rejection in § 1113. <u>See</u> <u>Massachusetts Air Conditioning</u>, 196 B.R. at 663 ("Section 1113 is designed to provide additional procedural requirements for rejection or modification of collective bargaining agreements, and only to that degree supersedes and supplements the provisions in § 365." (citing <u>Norfolk & Western Ry. Co. v. American Train Dispatchers Ass'n</u>, 499 U.S. 117, 136 n.2 (Stephens, J., dissenting); <u>Wien Air Alaska, Inc. v. Bachner</u>, 865 F.2d 1106, 1111 n.5, 1112 (9th Cir. 1989)).

We conclude that given the ambiguity in § 1113, § 365(b), coupled with Fed. R. Bankr. P. 6006[12] which provides that a proceeding to require a debtor to assume an executory contract is governed by Fed. R. Bankr. P. 9014,[13] governs the procedure for assumption of a CBA.[14] In comparable settings, the courts

_____

[12]Federal Rule of Bankruptcy Procedure 6006 provides in relevant part that a "proceeding to assume, reject, or assign an executory contract or unexpired lease, other than as part of a plan, is governed by Rule 9014." Fed. R. Bankr. P. 6006(a).

[13]Federal Rule of Bankruptcy Procedure 9014 provides in relevant part that "[i]n a contested matter in a case under the Code not otherwise governed by these rules, relief shall be requested by motion, and reasonable notice and opportunity for hearing shall be afforded the party against whom relief is sought." Fed. R. Bankr. P. 9014.

[14]The union argues that § 1113 governs the procedure for assumption of a CBA, while § 365 governs the effect of that assumption, specifically claiming that § 365 requires union employees' unpaid medical and dental expenses to be treated as administrative expenses upon the debtor's assumption of the CBA. As discussed *infra* in this opinion, this particular argument finds no support in the wording of § 1113 or § 365, or in the case law.

In addition, we underscore that the extent of our decision here is only that § 365(b) governs the debtor's assumption of the CBA. We do not take up the issue of whether other pieces of § 365 are imported in to § 1113 as well, though we acknowledge that courts have struggled with such issues. For example, courts disagree as to whether § 1113 displaces § 365(g), in other words, whether the debtor's rejection of the CBA gives the union employees a claim for damages. <u>See</u> Keating, 35 Wм. & Mary L. Rev. at 534-35 ("Some courts hold that because section 1113, unlike section 365, does not specifically provide that rejection gives rise to a claim, then no claim for rejection exists. Further, these courts contend that allowing union workers a claim based on the rejection of their labor contract

have so held.

For example, in American Flint Glass Workers Union v. Anchor Resolution Group, 197 F.3d 76, 82 (3d Cir. 1999), the debtor attempted to assume and assign a CBA. The union urged that § 365(k), which provides that a debtor may be relieved of its obligations under an executory contract if the contract has been assumed and assigned to another, did not apply. The Third Circuit disagreed, holding that §365(k) applied to relieve the debtor of its obligations under the CBA:

> there remains the argument that Anchor's non-adherence to the Code § 1113 route as to the AFU CBAs leaves it liable despite Code § 365(k)'s plain language. Code § 1113(a) reads:
>
>> The debtor in possession . . . may assume or reject a collective bargaining agreement only in accordance with the provisions of this section.
>
> Accordingly, the argument goes, Code § 1113 and not § 365 is the governing provision here. That contention rests on an extraordinarily thin reed: that the mere presence of the word "assume" in Code § 1113(a) requires the application of that provision even where no modification or rejection of a CBA has occurred. But that argument is at odds with the plain reading of Code § 1113, which (like the specific prohibition in Code § 1113(f)) speaks only to what must be done by a party in bankruptcy to change–or to free itself entirely from–the terms of a CBA. ... It is surely no accident that Code § 1113 is entitled "Rejection of Collective Bargaining Agreements," although we of course recognize that

would defeat the purpose of section 1113. ... Other courts have held that section 1113 was not meant to displace completely the provisions of section 365 as applied to collective bargaining agreements, but merely to supplement the Code's more general rules on the assumption or rejection of executory contracts. Accordingly, these courts hold that the rules of sections 365(g) and 502(g), which applied before the enactment of section 1113, should continue to govern these rejection cases, because the rules of section 365(g) and 502(g) are not inconsistent with the provisions of section 1113."). Compare In re Blue Diamond Coal Co., 147 B.R. 720, 729-30 (Bankr. E.D. Tenn. 1992); In re Armstrong Store Fixtures Corp., 139 B.R. 347, 350 (Bankr. W.D. Pa. 1992), with In re Texas Sheet Metals, Inc., 90 B.R. 260, 264 (Bankr. S.D. Tex. 1988); In re Garofalo's Finer Foods, Inc., 117 B.R. 363, 371 (Bankr. N.D. Ill. 1990).

More generally, courts have also found § 1113's relationship with other Bankruptcy Code provisions unclear. See, e.g., Jones Truck Lines, Inc. v. Central States, Southeast & Southwest Areas Pension Fund (In re Jones Truck Lines, Inc.), 130 F.3d 323, 330 (8th Cir. 1997) (discussing interplay between § 1113(f) and the Bankruptcy Code's preference provisions, specifically § 547).

such legislative captions are not part of the statute itself. We are persuaded that Code § 365 and not Code § 1113 is the applicable provision in the circumstances here.

Id. at 82 (internal citations omitted).

Similarly, in Massachusetts Air Conditioning and Heating Corp. v. McCoy, 196 B.R. 659, 663 (D. Mass. 1996), the debtor moved to assume its CBA under § 365 and Fed. R. Bankr. P. 6006(a). The bankruptcy court applied § 365, not § 1113, to the assumption of a CBA and the administrative expense treatment of claims thereunder as required by § 365(a)(1)(A). The district court affirmed:

> Thus, given the plain language of § 1113(b)-(f) (directed in operation solely to termination or alteration of collective bargaining agreements), and the remedial purpose behind its enactment (directed to securing special procedures before a collective bargaining agreement may be rejected or modified), I find that the use of the term assumption in § 1113(a) was at most sloppy legislative drafting. The reference to assumption appears simply to call out the character of rejection by identifying it with its opposite. Otherwise, assumption plays no part in the purpose or operation of § 1113. Section 1113 is designed to provide additional procedural requirements for rejection or modification of collective bargaining agreements, and only to that degree supercedes and supplements the provisions in § 365.
>
> By contrast, assumption of collective bargaining agreements continues to be governed by the provisions for executory contracts under § 365. Nothing in § 1113's plain language or legislative history indicates that Congress intended to alter Bildisco's holding that collective bargaining agreements are executory contracts. Because § 1113 speaks only to rejection, assumption of a collective bargaining agreement–like any other executory contract–remains within the province of § 365.

Id. at 663 (internal citations omitted). See also Adventure Resources, Inc. v. Holland, 137 F.3d 786, 798 (4th Cir. 1998) (reasoning that § 1113 has no application to assumption of CBAs; rather § 365 applies); In re Typocraft Co., 229 B.R. 685, 688 (Bankr. E.D. Mich. 1999) ("Given the language of almost all cases that have dealt with this issue to the effect that § 365 must be held to govern executory contracts including CBAs, except to the extent modified by § 1113, one must necessarily conclude that the process of 'assumption' of CBAs continues to be governed by the general provisions of statute and rule under §365.").

25

This line of authority, which looks to § 365 as the provision governing assumption of a CBA, best makes sense of the ambiguities regarding assumption in § 1113.[15] If a debtor seeks to assume a CBA, it must comply with the dictates of § 365. See In re Gateway Apparel, Inc., 238 B.R. 162, 164 (Bankr. E.D. Mo. 1999) (finding that under § 365, debtor's assumption of employee severance agreements requires affirmative action in the form of expression of clear intent by the debtor-in-possession, notice of the debtor-in-possession intention's to interested parties, and court approval of the debtor-in-possession's actions). In particular, the debtor must make a motion to do so as required by § 365(a) and Fed. R. Bankr. P. 9006(a) and 9014, effectively providing creditors and other affected parties with notice and an opportunity to be heard.[16] In addition, § 365 clearly requires the debtor to cure any default under the contract and provide adequate assurance of future performance of the contract. See 11 U.S.C. § 365(b)(1)(A) & (C) (1994). The other procedural safeguards contained in § 365 also apply, thus ensuring that assumption is an orderly, predictable court-controlled process.

---

[15]As the Appellees correctly point out, Congress could have expressly indicated, as it has done in other Code provisions, that § 1113 was not to be read in conjunction with or subject to the provisions of § 365. See 11 U.S.C. § 1367 (1994) ("*Notwithstanding section 365 of this title*, neither the court nor the trustee may change the wages or working conditions of employees of the debtor established by a collective bargaining agreement that is subject to the Railway Labor Act except in accordance with section 6 of such Act.") (emphasis added).

[16]The union asserts that since the parties can modify the CBA consensually under the provisions of the NLRA, they should be able to agree to the debtor's assumption of the CBA consensually. This assumes that the assumption of the CBA affects only the debtor and the union employees covered by the CBA and overlooks the very important fact that assumption of a CBA in the bankruptcy context dramatically affects other parties as well, namely, creditors and non-union employees. Indeed, the union acknowledges that the Debtor's actions with respect to assumption or rejection of the CBA and the accompanying treatment of the union employees' unpaid pre-petition medical and dental expenses bear directly on the final distributions to creditors under the plan.

2.      Assumption by Inaction or Denial of a Motion to Reject

The union disagrees and suggests that a CBA can be assumed impliedly under both § 1113 and § 365 when a debtor fails to act or, alternatively, that a debtor automatically assumes the CBA upon the court's denial of its motion to reject. This argument is flawed for two reasons. First, with rare exception, the case authorities referenced by the union deal with a wholly different legal question, one the union specifically disclaims relying upon. Second, to suggest that failed rejection *ipso facto* amounts to assumption severely misconstrues the nature of rejection of an executory contract.

a.      Assumption by Inaction

We first consider the cases cited by the union for the proposition that assumption may be implied from a debtor's failure to apply for rejection coupled with continuation of the business. Almost all of these cases discuss the issue of whether § 1113(f), which prohibits a debtor's unilateral rejection of the CBA, entitles unpaid union employees' expenses to superpriority treatment. See 11 U.S.C. § 1113(f) ("No provision of this title shall be construed to permit a trustee to unilaterally terminate or alter any provisions of a collective bargaining agreement prior to compliance with the provisions of this section."). Two lines of authority have developed on this issue.

The first stems from the Sixth Circuit's decision in In re Unimet Corp., 842 F.2d 879, 882-83 (6th Cir. 1988), cert. denied, 488 U.S. 828 (1988). There, the court held that a debtor-in-possession which has not rejected a CBA is obligated to pay retiree benefits that have accrued post-petition. See id. at 882. Unimet was followed by a long line of cases essentially holding that § 1113 was enacted to protect against a debtor's unilateral rejection of a CBA, including a debtor's failure to fulfill its obligations to pay union employees' benefits under the CBA. See, e.g., Acorn Bldg. Components, Inc., 170 B.R. 317, 320-21 (E.D. Mich. 1994); United Steelworkers of America v. The Ohio Corrugating Co., No. 4:90 CV 0810, 1991 WL 213850, at **3-4 (N.D. Ohio Jan. 3, 1991); In re Arlene's Sportswear, 140 B.R. 25, 27-28

27

(Bankr. D. Mass. 1992). More specifically, these cases stand for the proposition that a debtor's failure to pay employee benefits without first complying with the rejection procedures set forth in § 1113 represents a constructive assumption of the CBA. See Massachusetts Air Conditioning, 196 B.R. at 664 n.13. Section 1113(f) thus ensures that "§ 1113 shall trump all other sections of the Bankruptcy Code, including the priority provisions in § 507." Id.

In what has become the majority position, the second line, by contrast, reasons that § 1113 meshes with the priority scheme in § 507. In re Ionosphere Clubs, Inc., 22 F.3d 403, 407-408 (2d Cir. 1994) (Ionosphere II); In re Roth American, 975 F.2d 949, 956 (3d Cir. 1992); In re Moline, 144 B.R. 75, 78-79 (Bankr. N.D. Ill. 1992); In re Typocraft Co., 229 B.R. 685, 689 (Bankr. E.D. Mich. 1999); In re Spirit Holding Co., Inc., 157 B.R. 879, 882 (Bankr. E.D. Mo. 1993). The rationale under these cases is that the silence in § 1113 regarding how claims for unilateral rejection are to be treated requires use of other Bankruptcy Code sections, namely § 507. See Massachusetts Air Conditioning, 196 B.R. at 664 n.13.

Neither line of cases is relevant to our decision here. We do not even need to reach this issue of priority treatment of the union employees' unpaid medical and dental expenses because the union has specifically disclaimed resting its argument on § 1113(f). It has not suggested Debtor unilaterally modified the CBA, nor has it asserted any claim to superpriority treatment of its claims under § 1113(f). Presumably it has not done so because it likely could not establish the elements for unilateral rejection[17] or because it believed that we were unlikely to follow the older, now minority, Unimet view. In short, its citation to this line of authorities is not helpful.

---

[17]The union surely recognizes that Debtor acted promptly to reject the CBA and either paid its post-petition obligations under the CBA or ensured that such payments would be made by the asset purchaser.

28

Rather, the union maintains that we should follow the Fourth Circuit's decision in Adventure Resources, Inc. v. Holland, 137 F.3d 786 (4th Cir. 1998).[18] In Adventure Resources, a group of coal mining companies systematically, both before and after filing bankruptcy petitions, defaulted on obligations to provide certain pension benefits as required by a CBA. See id. at 791. The issue as framed by the court was whether "a debtor in bankruptcy operating under the aegis of Chapter 11 may, with regard to an executory contract in effect at the time of the filing of the petition for reorganization, continue to reap the benefits of its bargain without concern that the nondebtor party will be made whole for the debtor's unfulfilled prepetition obligations." Id. at 790. During the forty-three month duration of the Chapter 11 case, the debtors continued to operate using union employees, but failed to pay pension benefits as required under the terms of the CBA. See id. at 791. Expressly invoking § 365, not § 1113, the court held the debtors had assumed the CBA as a result of their "failure to reject it in accordance with §1113." Id. at 798. Moreover, upon assumption of the CBA, the court reasoned, the prepetition pension claims of the union employees were entitled to administrative expense priority. See id. at 798-99.

As a threshold matter, we think the concept of implied assumption of an executory contract is fatally flawed. A debtor may breach a contract by inaction, namely by failing to abide by its terms, or unilaterally

_____

[18]As support for its reading of Adventure Resources, the union also refers us to the following language in In re Moline Corp., 144 B.R. 75, 78 (Bankr. N.D. Ill. 1992): "[B]ecause of the more rigorous standards [of §1113], most collective bargaining agreements would be assumed either by inaction or denials of motions to reject." Like many of the other cases the union cites, In re Moline is a § 1113(f) case and, therefore, irrelevant to the resolution of the issues in this case. In addition, a close reading of the case evidences that the court's comment about assumption is dicta. The union also cites In re Roth American, Inc., 975 F.2d 949 (3d Cir. 1992). In Roth, the court did, in passing, state that a debtor may assume a CBA by failing to act to reject. See id. at 954. The issue in Roth was whether prepetition vacation and severance benefits owed to union employees would be entitled to administrative expense treatment. See id. at 953. While the court agreed with the union's argument that by failing to reject the debtor could be deemed to have "assumed," the court denied the union's request for administrative expense treatment. See id. at 957-58. Thus, the "assumption" of the CBA the court deemed could take place cannot be an assumption in the normal sense of the word, either under § 1113 (if that is what the court was referring to) or under § 365, because in order to assume a contract a debtor must, as a matter of law, cure all prepetition defaults.

modify or terminate a CBA under Section 1113, namely by failing to reject while taking advantage of workers (under one line of authority), but it cannot assume an executory contract by inaction. Implied assumption has no place in the law of executory contracts. Indeed, Section 365(d) presumes nonassumption by inaction, except in certain specified cases, such as nonresidential real property leases. See 11 U.S.C. § 365(d)(4) (1994). We find the Adventure Resources decision inconsistent with the explicit requirement under § 365 that a debtor may assume an executory contract only upon a motion. See U.S. Postal Serv. v. Dewey Freight Sys., Inc., 31 F.3d 620, 624 (8th Cir. 1994) (making clear that under § 365(a), rejection is "subject to the court's approval," and that a debtor seeking such approval must proceed by motion upon reasonable notice and opportunity for hearing); In re Gateway Apparel, Inc., 238 B.R. 162, 164 (Bankr. E.D. Mo. 1999) ("To be approved by the Court, the intention to assume must be clearly declared by the Debtor In Possession or Operating Trustee; and notice of this intention must be given to the necessary parties."); In re 1 Potato 2, Inc., 182 B.R. 540, 542 (Bankr. D. Minn. 1995) ("Bankruptcy Rule 6006(a) provides that a proceeding to assume or reject an unexpired lease is governed by Bankruptcy Rule 9014 which in turn states that such relief shall be requested by motion with reasonable notice and opportunity for hearing."); In re National Gypsum Co., 208 F.3d 498, 511 (5th Cir. 2000) (describing procedure for assumption of executory contract); In re United Nesco Container Corp., 47 B.R. 230, 233 (Bankr. E.D. Pa. 1985) (stating that proceeding to reject unexpired lease, other than as part of plan, is "contested matter," in which relief is requested by motion); In re GP Express Airlines, Inc., 200 B.R. 222, 230 (Bankr. D. Neb. 1996) (suggesting that only debtor-in-possession may seek assumption of executory contract).

Moreover, regardless of whether the court in Adventure Resources correctly determined that assumption may occur without the requisite motion by the debtor, the case is factually distinguishable from the facts this case. Unlike the debtors in Adventure Resources, the Debtor here did not "continue to reap the benefits of its bargain without concern that the nondebtor party will be made whole for the debtor's unfulfilled prepetition obligations." Adventure Resources, 137 F.3d at 790. Instead, recognizing its dire financial situation, Debtor actively sought a purchaser and moved quickly to liquidate its assets. It never

30

indicated that it had any intention of remaining in business at the expense of its employees. It initiated the rejection process almost immediately after the asset sale took place and arranged for the purchaser to assume or pay, or itself assumed and paid, the Debtor's post-petition obligations under the CBA. Almost all of the Debtor's employees, both union and non-union, were rehired by the purchaser under terms and conditions nearly as favorable as those under the CBA. Thus, to the extent Adventure Resources stands for the proposition that there is a concept of assumption by inaction under § 365, the facts in that case are so disparate as to make it inapplicable to this case.

b.      Assumption as a Result of Denial of a Motion to Reject

Next we address the union's contention that even if assumption by inaction is not permissible, then certainly assumption follows *ipso facto* when a debtor applies to reject the CBA and the bankruptcy court denies that application. More precisely, the union's argument here is that because assumption represents the flip-side of rejection, if a debtor tries to reject and loses, the end result must be assumption. To support its argument, the union cites the Lady H Coal and In re Moline cases.

In Lady H, the court considered the debtor's application to reject its CBA in conjunction with a sale of substantially all of its assets. See Lady H, 193 B.R. at 235. The court denied the debtor's application to reject, reasoning that rejection was not in the best interests of all affected parties under one of the American Provision factors. See id. at 241. But the court did approve the asset sale and permitted the union employees to amend their proofs of claim to assert administrative expense priority for the debtor's breach of the CBA. See id. at 242. The court did not, however, discuss the issue of assumption of the CBA upon the court's denial of the debtor's application to reject, nor did the court find that the debtor assumed the CBA upon denial of the application to reject. In that regard, the Lady H case is not helpful and neither explicitly, nor implicitly, seems to support the union's position. As for In re Moline, the court admittedly provided language to support the union's argument: "because of the more rigorous standards [of § 1113], most collective bargaining agreements would be assumed either by inaction or denials of

31

motions to reject." 144 B.R. at 78. But we find this rather cursory reference about assumption upon denial of an application to reject to be mere dicta and, therefore, not controlling or substantive.

Finding no case law directly on point, we treat this second issue as one of first impression. We begin with the widely-accepted premise that rejection represents "a bankruptcy estate's decision not to assume." Michael T. Andrew, *Executory Contracts in Bankruptcy: Understanding "Rejection,"* 59 U. COLO. L. REV. 845, 848 (1988) [hereinafter Andrew]. The debtor's decision to reject (or not to assume) "giv[es] rise to a presumption that the debtor has 'breached'" or "will not perform its obligations." Andrew, 59 U. COLO. L. REV. at 881, 931 ("'Rejection,' although it requires a formal act and court approval in a reorganization case, is still the same concept: it is the estate's (formal) determination not to assume the contract or lease, and its occurrence triggers the ancillary rule that a 'breach' of the debtor's obligations will be deemed to have occurred as of the commencement of bankruptcy, thus permitting a claim by the non-debtor."). Accordingly, it logically follows that the debtor's failure to take affirmative steps to assume or to reject an executory contract or unexpired lease in a reorganization case results in that contract or lease "rid[ing] through" the bankruptcy case unaffected. Andrew, 59 U. COLO. L. REV. at 881. See generally In re Texaco, Inc., 254 B.R. 536, 557-58 (Bankr. S.D.N.Y. 2000) (citing, inter alia, In re Cajun Elec. Power Co-op, Inc., 230 B.R. 715, 734 (Bankr. M.D. La. 1999) (executory contracts which are neither assumed nor rejected during a Chapter 11 proceeding flow through the proceeding "without alteration"); In re Nevada Emergency Servs., Inc., 39 B.R. 859, 861 n.1 (Bankr. D. Nev. 1984) ("[C]ase law developed under past and current law supports the conclusion that such contracts pass through the reorganization proceedings unaffected and become an obligation of the reorganized debtor.")). Moreover, we again reiterate that "[t]he decision to assume or reject a contract or lease [under section 365] must be approved by the court." Collier on Bankruptcy ¶ 365.03 (Lawrence P. King ed., 15th rev. ed. 1999) (citing Thinking Machs. Corp. v. Mellon Fin. Servs. Corp. (In re Thinking Machs. Corp.), 67 F.3d 1021, 1025 (1st Cir. 1995) ("court approval is a condition precedent to the effectiveness of a trustee's rejection of a nonresidential lease"). See also Elliott v. Four Seasons Props. (In re Frontier Props., Inc.), 979 F.2d 1358 (9th Cir. 1992) (court approval of stipulation providing for the assumption

32

of a lease satisfies the requirement that an assumption or rejection be approved by the court)); In re Price Chopper Supermarkets, Inc., 19 B.R. 462, 466-67 (Bankr. S.D. Cal. 1982) ("Since there is no automatic assumption or rejection in a Chapter 11 proceeding, then any action must be presented for court approval." (citing Collier on Bankruptcy ¶ 365.03 (15th ed. 1982)); Sealy Uptown, L.P. v. Kelly Lyn Franchise Co., Inc. (In re Kelly Lyn Franchise Co., Inc.), 26 B.R. 441, 444, 445 (Bankr. M.D. Tenn. 1983) (noting that § 365(a) makes clear assumption of an executory contract can only occur upon express order of the court).

Accordingly, accepting Andrew's definition, a request to reject is the antithesis of a request for assumption, not merely its flip-side. In seeking to reject, or actually rejecting, the CBA, a debtor makes clear its intention *not* to assume. Coupled with well-established case law that a debtor must seek assumption by court order, this understanding of the meaning of rejection undermines the union's argument that denial of a debtor's motion to reject results in assumption. In short, we reject the union's argument. A debtor who seeks one form of relief–rejection of the CBA–should not end up with precisely the opposite–assumption of the CBA.

The union's argument also carries with it a litany of practical problems. For example, automatic assumption would yield unpredictably; creditors and other interested parties would not know whether to support or oppose the debtor's motion to reject. Moreover, because none of the procedural rules governing when a debtor may or must seek assumption or when a creditor may force a debtor's decision to assume or reject would apply, a debtor would likely put off dealing with the CBA entirely, leaving union employees hanging. Further, the parties seem to agree that in this case the Debtor cannot cure prepetition defaults so as to meet a threshold requirement for assumption.

We agree with the bankruptcy court that when a court denies a motion to reject, the inevitable result is not assumption. There is a fundamental difference under § 1113 between the CBA remaining in effect upon denial of a debtor's motion to reject and the debtor's actual assumption of the CBA. Section 1113(f), as construed by the cases arising under that provision, clearly provides that the CBA remains in

effect until rejected. <u>See</u>, <u>e.g.</u>, <u>In re Manor Oak Skilled Nursing Facilities</u>, 201 B.R. 348, 350 (Bankr. W.D.N.Y. 1996) (stating that "all aspects of a collective bargaining agreement remain in effect and binding until rejection occurs").[19]  But the notion that the CBA remains operative during the course of the bankruptcy prior to rejection is wholly separate and distinct from the notion that the debtor has affirmatively assumed the CBA and undertaken all of the obligations that accompany such a decision under § 365.  The debtor alone determines whether and when within the course of the bankruptcy case to seek assumption of the CBA under § 365 or rejection of that agreement under § 1113.  Moreover, it seems that a denial of a rejection application could no doubt be followed, not by assumption, but by a renewed motion to reject under changed circumstances.  And, finally, as the bankruptcy court correctly pointed out, there may be good reason for a liquidating debtor to defer making a decision about the CBA until after the asset sale, because assuming a CBA before conversion to a Chapter 7 may seriously disadvantage other unsecured creditors.  <u>See</u> <u>In re Rufener</u>, 53 F.3d at 1066 (noting that § 1113 does not apply in a Chapter 11 case which is later converted to a Chapter 7 case).

---

[19]Of course, a debtor does not escape its liabilities and obligations under the CBA simply by failing to take steps to assume or reject that contract during the course of the bankruptcy case.  As discussed *supra*, if a debtor fails to assume or reject the CBA or delays in making such a decision and the CBA effectively "rides through" the bankruptcy process, there are several possible consequences. For example, the CBA will be treated as an executory contract under § 365, rather than § 1113, in a Chapter 11 case which is converted to a Chapter 7 case.  <u>See</u>, <u>e.g.</u>, <u>Carpenters Health & Welfare Trust Funds for California v. Robertson</u> (<u>In re Rufener Constr., Inc.</u>), 53 F.3d 1064, 1066 (9th Cir. 1995)(noting that § 1113 is inapplicable to case converted from Chapter 11 to Chapter 7).  In addition, the debtor may be found to have unilaterally modified or altered the CBA in violation of § 1113(f).  <u>See</u> <u>Massachusetts Air Conditioning</u>, 196 B.R. at 664 n.13; <u>In re Ionosphere Clubs, Inc.</u>, 22 F.3d 403, 407-408 (2d Cir. 1994); <u>In re Arlene's Sportswear</u>, 140 B.R. 25, 27-28 (Bankr. D. Mass. 1992). This last scenario, in turn, raises all kinds of issues about how the union's claims for unpaid *pre-petition* claims should be treated, specifically whether such claims are entitled to priority treatment as administrative expenses or whether they are treated like other claims under the priority scheme of § 507.  <u>See</u> <u>Massachusetts Air Conditioning</u>, 196 B.R. at 664 n. 13 (discussing the split of authority on this issue); <u>see</u> <u>also</u> Keating, 35 WM. & MARY L. REV. at 539-548 (discussing courts' differing views on the priority treatment of pre-petition claims).  We decline to address such issues because they are not before us in this case.

ACCORDINGLY, we reverse the decision of the bankruptcy court on the issue of whether the debtor can reject the CBA after the § 363 asset sale and remand for further action consistent with this opinion. We affirm on the issue of whether assumption occurred as a result of the bankruptcy court's denial of the application to reject.

A true copy.


Attest:


CLERK, U.S. BANKRUPTCY APPELLATE PANEL
FOR THE EIGHTH CIRCUIT